(571 P.2d 26)
No. 48,911

JACK L. WRIGHT, *Appellant,* v. Mr. R. R. RAINES, Secretary of Corrections, Mr. K. G. OLIVER, Director of Kansas State Penitentiary, LT. K. LYNCH, *et al., Appellees.*

Petition for review denied September 12, 1977.
*Certiorari* denied March 20, 1978.

No. 48,992

KENNETH CHILDERS, *Appellant,* v. R. R. RAINES, Secretary of Corrections, K. G. OLIVER, Director of Kansas State Penitentiary, LT. KENNETH LYNCH, *et al., Appellees.*

Opinion filed July 22, 1977.

*Michael F. Willcott,* of Leavenworth, for the appellant, Jack L. Wright.

*William E. Pray,* of Leavenworth, for the appellant, Kenneth Childers.

*Roger M. Theis,* assistant attorney general, and *Curt T. Schneider,* attorney general, for the appellees.

Before HARMAN, C.J., FOTH and SPENCER, JJ.

SPENCER, J.: Appellants are prisoners at the Kansas State Penitentiary at Lansing and each has appealed from an order of the district court dismissing his petition for a writ of habeas corpus under the provisions of K.S.A. 60-1501, *et seq.*

The issues here involved are identical and, although dealt with separately in the trial court and docketed separately in this court, we deem it appropriate to consolidate the appeals for this opinion. Counsel for each petitioner has indicated his agreement to our doing so.

We have been furnished Department of Corrections Administrative Procedure 207, "Standard of Cleanliness to be Observed/Hair Standards for Male Inmates," which provides in part:

"2. The Department's hair standards for male inmates, effective January 15, 1977, are:

"a. Upon admission to the custody of the Secretary of Corrections, or return for parole violation, male inmates' hair will be cut to approximately one and one-half (1½) inches in length; they will be clean shaven of beards and mustaches. These regulations apply to inmates received directly at the Reception and Diagnostic Center and to those who are received at the other adult male institutions. Mug photos for identification purposes will be taken before and after the admission haircut, within five (5) days after being received.

"b. Male inmates, regardless of their admission date, will not be permitted to grow sideburns below the bottom of the ear and will not be permitted to grow beards.

"c. Male inmates, regardless of their admission date, are permitted to grow mustaches, not to extend beyond the outer corners of the mouth."

Petitioners allege that respondents-appellees' attempts to enforce the policy prohibiting the wearing of beards is in violation of their First Amendment rights in that each is a member of the Sikh religion, among the tenets of which is the prohibition of cutting hair from the body.

Both petitions are handwritten, *pro se,* and entitled "Petition For A Writ Of Habeas Corpus." The Wright petition was filed March 1, 1977; the Childers petition was filed March 17, 1977.

The Wright petition alleges that on or about January 28, 1977, Lt. Kenneth Lynch, officer in charge of the Adjustment and Training Building at the Kansas State Penitentiary, informed Wright that he (Wright) must shave off his beard. Wright informed Lt. Lynch that his religious beliefs prohibited him from doing so. On January 31, 1977, Wright was denied all "privileges" because of his refusal to shave. The petition also alleges that all administrative remedies have been exhausted.

The Childers petition alleges that on or about January 25, 1977, Childers was requested by Lt. Lynch to shave his beard; that Childers informed Lt. Lynch that he could not comply because of his religious beliefs; but thereafter, because of threats of loss of good time and out of ignorance of his constitutional rights, Childers did comply and did shave. On February 1, 1977, Childers was transferred to the Larned State Hospital where he was allegedly beaten and sustained injuries. Upon his return to Lansing on February 12, 1977, he was allowed to refrain from shaving in order that the cuts he had received in the beating could heal. However, on March 11, 1977, Lt. Lynch informed Childers that he must shave his beard, to which Childers again replied that his religion would not permit him to do so. Having in the interim been informed of his constitutional rights, Childers did not this time comply with the order. He was subsequently denied all "privileges." The petition also alleges that all administrative remedies have been exhausted.

We make note here of information furnished the court upon oral argument to the effect that Wright entered the penitentiary with his beard and presumably his religion; and that Childers, who perhaps was a prison convert, developed his beard while in confinement.

Each petition was denied summarily on the day it was filed. The orders of dismissal are identical and read as follows:

"MEMORANDUM AND ORDER

"Petitioner has filed in the above-captioned case a petition for the issuance of a writ of habeas corpus.

"Petitioner alleges that he is being denied the privilege of wearing a beard and other evidence of his status as a member of the SIKH religion in violation of his constitutional rights in contravention of institutional regulations.

"This Court concludes that the petition fails to state a claim upon which relief can be granted in a habeas corpus proceeding and that a writ should not be issued.

"IT IS, THEREFORE, ORDERED that the petition for a writ of habeas corpus filed herein be denied and that this action be, and the same is hereby, dismissed."

The designated points on appeal in each case are substantially the same and, in the final analysis, the issue here is whether in the absence of responsive pleading or an evidentiary hearing, the trial court may properly dismiss the petitions as failing "to state a claim upon which relief can be granted in a habeas corpus proceeding. . . ."

Bearing in mind that petitioners claim a violation of their First Amendment rights that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ," as made applicable to the states by the Fourteenth Amendment to the Constitution, we consider first whether in fact we are dealing with an established religion.

Our very brief and limited research in this respect, taken from The New Schaff-Herzog Encyclopedia of Religious Knowledge, Vol. 10, p. 408, *et seq.,* reveals that "Sikh" is a term applied to a religious group concentrated in northwest India. The term meaning "disciple" is the correlative of guru "teacher." The religion was founded and developed by a series of ten gurus, who in turn trace the beginnings of their faith to one Kabir, circa 1400 A.D. The first guru, Nanak, was active circa 1500 A.D. The principal book of the Sikhs is the Adi Granth or Granth Sahib. The religion is sometimes said to be an attempt to reconcile Hinduism, Buddhism, and Islam, although it is generally recognized to be a Hindu sect.

The history of the Sikhs is obscure after 1708 (the death of the last of the ten gurus). After 1800 they gradually took political and military control of the Punjab and fought with the British until 1848. Following the victory of the British, many of the Sikhs entered the British Army while in India.

From Buddhism the faith takes as one of its tenets belief in Nirvana. The essentials of Sikh practice are abstention from idolatry, wine and tobacco; observance of the caste system is prohibited; the duty to earn one's living is expressed. True Sikhs are distinguished by the wearing of five articles—long hair, comb, sword, white clothing, and steel bracelet. From a publication originating at the Sikh Dharma Brotherhood headquarters at Los Angeles, California, furnished us by counsel for the appellants, we learn that one of the qualifications of a Sikh is as follows:

"C. He shall keep his form in the simple existence as God made him, thereby not removing hairs and keeping them long, intact and natural.

"1. The man shall tie his hair in a Rishi knot on the crown of his head to be covered by a cotton cloth known as a turban whenever in public. He will be obliged to keep a dastar (small turban) when he is without his turban. In those situations which require it, he may wear a steel mail over his dastar, over which a turban is to be tied.

"2. The woman shall wear her hair on the top of her head and keep it covered with a turban or chuni when in public."

From evidence made available to us at this time, we must conclude that the Sikh Dharma, referred to in this opinion as "Sikh," is an established and recognized religion to which the petitioners may subscribe.

At this point, we deem it well to make note of the recent decision of the United States Supreme Court in the case of *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 53 L.Ed.2d 629, 97 S.Ct 2532 (1977). In that case, Justice Rehnquist prefaced his opinion by reference to certain peculiar and restrictive circumstances of penal confinement as follows:
ment as follows:

". . . [T]his Court has long recognized that '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' . . . The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration. We noted in *Pell v. Procunier*, [417 U.S. 817 (1974)] at 822:

'[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.' . . ." (p. 125.)

The case of *Levier v. State*, 209 Kan. 442, 497 P.2d 265, involved allegations in habeas corpus petitions of mistreatment of prisoners held in the A & T Building at Lansing. Included were allegations of denial of medical treatment, lack of exercise or work facilities, and injuries inflicted by guards. In an opinion prepared by then Commissioner Harman, now Chief Judge of this court, certain principles of law were set forth as follows:

"An inmate confined in a penal institution retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." (Syl. 1.)

"The rights of an inmate include entitlement to adequate food, light, clothing, medical care and treatment, sanitary facilities, reasonable opportunity for physical exercise and protection against physical or psychological abuse or unnecessary indignity." (Syl. 2.)

"Habeas corpus provides an appropriate remedy for inquiry into mistreatment of a continuing or probably continuing nature alleged by an inmate of a penal institution." (Syl. 3.)

It was there cautioned, however, that:

"Prison officials as executive officers of the state are charged with the control and administration of the penal institutions of the state and as such are vested with wide discretion in the discharge of their duties. That discretion should not be interfered with by the courts in the absence of abuse or unless exercised unlawfully, arbitrarily or capriciously." (Syl. 4.)

It was there held that, for reasons stated in the opinion, the judgment summarily denying relief and habeas corpus be reversed with directions to appoint counsel for petitioners and conduct evidentiary hearings upon issues joined. We again note that the petitions in these consolidated cases were summarily dismissed on the dates of the filing of those petitions and note further that counsel for petitioners were not appointed except for the purposes of the appeals.

In the present case it appears that the deprivations alleged to be the result of the petitioners' insistence on adhering to their religious beliefs will be of a "continuous or probably continuing nature." Such was not the case in *Breier v. Raines,* 221 Kan. 439, 559 P.2d 813, which affirmed a summary dismissal of a habeas corpus petition based upon a sexual assault by another inmate and events flowing therefrom. These petitions in effect allege an unlawful exercise of discretion by the prison officials in their control of the prison and the inmates in that the penalties visited upon the petitioners are in violation of their First Amendment right of religious freedom. Thus, the case is not one which on its face involves purely a matter within the discretion of the prison authorities.

The discretion of prison officials in matters of internal management of the prison, "unless clearly arbitrary or shocking to the conscience," was reemphasized in the recent case of *Foster v. Maynard,* 222 Kan. 506, Syl. 1, 565 P.2d 285, which involved claims of denial of equal protection by inmates housed at the A & T Building at Lansing. There, the supreme court affirmed a denial of relief after an evidentiary hearing.

The free exercise of religion is a protected right (U.S. Const. amend. I; Kan. Const., Bill of Rights Sec. 7). The U.S. Supreme Court has recognized that prisoners retain "substantial religious freedom under the First and Fourteenth Amendments." (*Wolff v. McDonnell,* 418 U.S. 539, 556, 41 L.Ed.2d 935, 94 S.Ct. 2963 [1974].) In this case, the petitioners argue that it was error for the district court to dismiss their petitions, alleging punishment by means of denial of all privileges due to their adherence to their

religious beliefs, without responsive pleading or an evidentiary hearing. The state argues that the challenged prison regulation requiring the inmates to be clean shaven is reasonable and justified in itself and that no hearing was necessary.

It appears from those cases cited in appellee's brief that the 5th Circuit Court of Appeals has held that petitions challenging shaving regulations on religious grounds may be summarily dismissed without hearing. *Brown v. Wainwright,* 419 F.2d 1376 (5th Cir. 1970); *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir. 1970); *Hill v. Estelle,* 537 F.2d 214 (5th Cir. 1976). On the other hand, the 2d Circuit has specifically held that in cases where a claim is made by a prisoner professing a legitimate belief in an established religion that prohibits the cutting of hair, a hearing must be held to determine if the state's purpose in requiring beards to be cut outweighs the claimed religious right. *Burgin v. Henderson,* 536 F.2d 501 (2d Cir. 1976). *Burgin* distinguished *Brooks* and *Brown* as involving "somewhat idiosyncratic claims that beards had religious significance. . . ." (536 F.2d at 503 n. 4.) In that case, it was said:

". . . It may well be that the state's interest in hygiene and identification of inmates outweighs the prisoner's interest in growing a beard as required by his religion, but there is nothing in the record now to show that. As we pointed out in *Sostre v. Preiser* [519 F.2d 763 (2d Cir. 1975)] at 764:

"But even if the institutional purpose is legitimate and substantial, 'that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' . . .

At the very least, a record must be made as to what the no-beard rule is; how it is applied; whether any beards are allowed; whether, as plaintiffs allege, there is no hygienic problem; and whether the need for identification requires total prohibition of beards, rather than some narrower limitation." (536 F.2d at 504.)

The case of *Kennedy v. Meacham,* 540 F.2d 1057 (10th Cir. 1976) involved *pro se* complaints by prisoners at the Wyoming State Penitentiary that prison officials acted to restrict their practice of the Satanic religion, in violation of the First Amendment. The district court dismissed the case before any responsive pleading. The 10th Circuit reversed saying:

"It is true that overt acts prompted by religious beliefs or principles are subject to some regulation . . . and the circumstance of imprisonment is, of course, a factor that bears on the lawfulness of limitations. . . . While in custody inmates have only such rights in practice of their religion as can be exercised without impairing requirements of prison discipline. . . . Again, however,

the dismissal was made before there was any assertion by defendants that their actions were taken as necessary security or control measures in the prison, and without any pleading or proof of the surrounding circumstances.

"We are persuaded that the asserted justification of such restrictions on religious practices based on the State's interest in maintaining order and discipline must be shown to outweigh the inmates' First Amendment rights. . . . Hence we conclude we must vacate the judgment of dismissal and remand for further proceedings. If it is determined that the practice of a religious belief is involved, and that there are restrictions imposed on its exercise, then the court should further determine whether any incidental burden on fundamental First Amendment rights is justified by a compelling state interest in the regulation of prison affairs, within the State's constitutional power. . . . For '. . . only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.' *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15." (540 F.2d at 1061.)

It may well be that there are compelling state interests which justify the restrictions imposed and that there are no less restrictive methods of achieving the goals of the regulation that all male inmates will be clean shaven of beards, whether those interests serve the purpose of identification or hygiene or whatever. But we are convinced that such restrictions are not to be imposed so as to deny the free exercise of an established religious faith without a proper determination of compelling state interests in doing so, and without the further determination that there are no less restrictive methods of achieving the object of the regulation. Only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. Although not clearly shown by the record, it appears that it was not until January 15, 1977, that such a regulation was put into effect. Whether it is justified where First Amendment rights are involved is a matter for an evidentiary hearing.

The issue here involved, although not always in the religious context, was considered and the regulation upheld in *Winsby v. Walsh,* 321 F. Supp. 523 (C.D. Cal. 1971); *Williams v. Batton,* 342 F. Supp. 1110 (E.D.N.C. 1972); *Rinehart v. Brewer,* 360 F. Supp. 105 (S.D. Iowa 1973); and *Collins v. Haga,* 373 F. Supp. 923 (W.D. Va. 1974). In the following cases the regulations were found invalid when weighed against religious claims by the prisoners involved: *Teterud v. Gillman,* 385 F. Supp. 153 (S.D. Iowa 1974), aff'd *sub nom Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975); *Monroe v. Bombard,* 422 F. Supp. 211 (S.D.N.Y. 1976). See also, *Oritz v. Ward,* 384 N.Y.S.2d 960, 87 Misc.2d 307 (Sup. Ct. 1976).

We conclude that the orders of dismissal entered in these cases must be vacated and these matters remanded to the trial court for further proceedings in conformity herewith.