(893 P.2d 842)
No. 72,121

KEVIN E. GRAY, *Appellant*, v. MICHAEL A. NELSON, WARDEN, M. K. BARNES, LIEUTENANT OF I & I, and DAVID SUTTLE, UNIT TEAM MANAGER, EL DORADO CORRECTIONAL FACILITY, *Appellees*.

Opinion filed April 14, 1995.

*Steven C. Sherwood*, of Legal Services for Prisoners, Inc., of El Dorado, for appellant.

*Lou Allen* and *Julie L. Riddle*, special assistant attorneys general, for appellee.

Before BRAZIL, P.J., GERNON, J., and DAVID J. KING, District Judge, assigned.

GERNON, J.: Kevin E. Gray appeals the trial court's dismissal of his K.S.A. 60-1501 petition in which he alleged a violation of his constitutional right to due process.

Gray is an inmate at the El Dorado Correctional Facility. Gray was placed in administrative segregation, and, 13 minutes later, an administrative segregation report (ASR) was filed, stating that Gray was placed in administrative segregation "pending the results of an investigation." The ASR stated that Gray was placed in administrative segregation before he received a report as to the basis for his segregation in order to "prevent any disruptive behavior" and that a pre-segregation report hearing had been held. All of the above events occurred within a three-hour period.

Kansas law empowers the Department of Corrections (DOC) to promulgate regulations relating to those in the custody of the DOC. Among the regulations in effect at the time of Gray's incarceration were regulations covering the physical control of inmates within institutions run by the DOC. Such physical control, termed segregation, is divided into two types: administrative and disciplinary.

Disciplinary segregation is used as punishment. K.A.R. 44-14-201; see K.S.A. 1994 Supp. 75-5252.

Administrative segregation is used where, in the view of the corrections officials, segregation is necessary for some reason other than punishment: for example, to prevent communication between prisoners; to prevent the intimidation of a prisoner who is a witness or an accuser; to prevent any further disruption or danger to any inmate; for prehearing detention on a disciplinary matter; to prevent the spread of disease; to separate those who are suicidal or have a history of physical or sexual attacks or mental problems; to separate a potentially dangerous cellmate; to prevent escape; or when an inmate engages in an activity which presents a disruption, creates a security risk, or is a danger to the inmate or others. K.A.R. 44-14-302.

In Gray's case, the following facts were used to support his continuing segregation after a second ASR was filed two days after he was placed in administrative segregation:

"INMATE GRAY ON 1/6/93 AT APPROXIMATELY 0850 HRS. ENTERED INTO A GENERAL POPULATION CELLHOUSE TO WHICH HE WAS NOT ASSIGNED. THE INVESTIGATION OF THIS MATTER HAS NOT REVEALED THE REASON FOR THIS INMATE'S BEING IN THE UN-

ASSIGNED CELLHOUSE. DUE TO THESE FACTS INMATE GRAY POSES A THREAT TO THE SECURITY AND CONTROL OF THIS FACILITY."

Gray remained in administrative segregation from January 6, 1993, until February 2, 1994. During that period of time, the Administrative Segregation Review Board (ASRB) reviewed Gray's status and issued reports 21 times. The ASRB report shows that Gray appeared before the ASRB on January 7, 1993, and at all of the reviews from March 11 through November 12, 1993. Throughout this period of time, Gray's status remained "other security risk" pursuant to K.A.R. 44-14-302(g).

Gray filed a habeas corpus petition after exhausting his administrative remedies. The district court appointed counsel and issued a show cause order in April 1994. The appellees filed a motion to dismiss pursuant to K.S.A. 60-212(b)(6).

At the show cause hearing, the district court found that "as to whether minimal due process requirements were adhered to, . . . this matter was investigated under pending investigation under sections . . . (a) (c) (d) and (f), whereby the inmate can be placed into administrative segregation on an emergency finding"; that "within 48 hours thereto of the incident a pre-segregation hearing was held whereby reason for confinement was brought before the inmate"; and that "the correctional facility was in compliance thereto." Finding that no evidentiary hearing was necessary, the district court granted the motion to dismiss. The journal entry merely states that the court found that all procedures were followed by the defendants and that Gray's due process rights were not violated. Gray appeals.

Two questions are raised by Gray. The first concerns the initial placement of Gray in administrative segregation and whether he had a liberty interest which is protected by constitutional due process. The other question involves the dismissal of his petition without an evidentiary hearing.

Framed more specifically, the first question is whether an inmate has a liberty interest in remaining in the general prison population.

Gray takes issue with his initial placement in administrative segregation. Gray contends that he was placed in administrative seg-

regation without any meaningful pre-segregation hearing, without sufficient notice, and without sufficient cause under the existing regulations. Although Gray only incidentally mentions the constitutional issue, the due process issue is the gravamen of his argument and, therefore, must be addressed.

This court, in *Swisher v. Hamilton*, 12 Kan. App. 2d 183, 184-85, 740 P.2d 95, *rev. denied* 242 Kan. 905 (1987), stated:

> "Proceedings on a petition for writ of habeas corpus filed pursuant to K.S.A. 60-1501 are not subject to the ordinary rules of civil procedure. According to K.S.A. 60-1505(a), '[t]he judge shall proceed in a summary way to hear and determine the cause.' In addition, the summary dismissal of a habeas corpus petition has been affirmed in a number of cases. See *Breier v. Raines*, 221 Kan. 439, 559 P.2d 813 (1977); *Highman v. Marquez*, 5 Kan. App. 2d 158, 160, 613 P.2d 394 (1980). These cases reflect adherence to the principle that the maintenance and administration of penal institutions are executive functions and, before courts will interfere, the institutional treatment must be of such a nature as to clearly infringe upon constitutional rights, be of such character or consequence as to shock the general conscience, or be intolerable to fundamental fairness. *Levier v. State*, 209 Kan. 442, 451, 497 P.2d 265 (1972). Therefore, to avoid summary dismissal of a K.S.A. 60-1501 petition, allegations must be made of shocking and intolerable conduct or continuing mistreatment of a constitutional stature. See, *e.g., Wright v. Raines*, 1 Kan. App. 2d 494, 499-501, 571 P.2d 26, *rev. denied* 222 Kan. 749 (1977), *cert. denied* 435 U.S. 933 (1978) (challenge to hair length regulations where petitioner alleged to have legitimate belief in an established religion that prohibits cutting hair)."

This issue was considered by the United States Supreme Court in *Hewitt v. Helms*, 459 U.S. 460, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983). Helms had been placed in administrative segregation after a prison riot, pending an investigation into his role in the riot. Helms claimed that his confinement in administrative segregation violated his constitutional rights to due process. The United States Court of Appeals for the Third Circuit held that Pennsylvania state law had created a protected liberty interest requiring minimal due process. The United States Supreme Court reversed, agreeing that the liberty interest had been created but finding that the process received by Helms was sufficient to meet due process standards.

The *Hewitt* Court noted that liberty interests requiring protection under the Due Process Clause may arise from the Due

Process Clause itself or from state laws. 459 U.S. at 466. " '[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' " 459 U.S. at 468 (quoting *Montanye v. Haymes*, 427 U.S. 236, 242, 49 L. Ed. 2d 466, 96 S. Ct. 2543 [1976]). Under this standard, the Court held that transferring an inmate to a more restrictive setting within the prison did not give rise to an interest independently protected by the Due Process Clause. 459 U.S. at 468.

However, the Court did find that the State had created a protected liberty interest. Because the state regulations had gone beyond simple procedural guidelines and used language of an "unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed . . . and that administrative segregation will not occur absent specified substantive predicates," the state regulations had created a protected liberty interest in not being placed in administrative segregation arbitrarily. 459 U.S. at 471-72. The relevant Pennsylvania regulations required that after investigation, " '[i]f no behavior violation has occurred, the inmate must be released.' " 459 U.S. at 470 n.6.

Having found a state-created liberty interest, the Court examined the question of whether the process afforded to Helms had satisfied the minimum requirements of the Due Process Clause. Such requirements, the Court found, were fact specific and flexible. The Court held that prison officials are "obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation." 459 U.S. at 472. This informal, nonadversarial procedure is sufficient for both the decision that the inmate poses a security threat and the decision to place the inmate in administrative segregation. The inmate need only receive some notice of the charges against him or her and an opportunity to present his or her views to the prison official. 459 U.S. at 476.

The *Hewitt* Court stated as follows:

"Nonetheless, in this case the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, [citation omitted], and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.' Petitioners argue, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." 459 U.S. at 471-72.

The Pennsylvania regulations which prompted the United States Supreme Court in *Hewitt* to find a liberty interest had been created by the state are remarkably similar to the Kansas regulations in their word patterns and in the use of "may" and "shall." For example, in Pennsylvania, the regulation read:

"An inmate who has allegedly committed a Class I Misconduct *may* be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title." 37 Pa. Code § 95.104(b)(1) (1978). (Emphasis added.)

The regulation went on to state:

"An inmate *may* be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing . . . ." 37 Pa. Code § 95.104(b)(3) (1978). (Emphasis added.)

The Kansas regulations state in part:

"Inmates *may* be confined in administrative segregation for any of the following reasons or under any of the following conditions . . . .

. . . .

"(1) Inmates may be placed in administrative segregation pending the completion of an investigation to determine whether charges should be brought." K.A.R. 44-14-302. (Emphasis added.)

It is inherent in the nature of the management of penal institutions that the initial discipline or administrative segregation

will be a discretionary function based upon the judgment of a correctional officer. Once that decision is made in Kansas, as in Pennsylvania under the provisions in effect at the time *Hewitt* was decided, a host of mandatory procedures instantly attach to the process which require notifications, written reports, and continued periodic hearings for as long as an individual is in administrative segregation.

Given the similarity in language and the holding in *Hewitt*, we are persuaded, as was the United States Supreme Court in *Hewitt*, that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates" demands our conclusion that Kansas has created a protected liberty interest.

It is necessary for us to recognize the holding in *Jones v. Marquez*, 526 F. Supp. 871 (D. Kan. 1981), in which the court stated *Montanye v. Haymes*, 427 U.S. 236, and *Meachum v. Fano*, 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976), held that

"the process protections were not triggered by a prisoner's transfer for either administrative or disciplinary reasons to another state prison where living conditions were substantially more restrictive, in the absence of a state law or practice conditioning such transfers upon the occurrence of specified events. The Court explained:

'. . . as long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' *Montanye v. Haymes*, supra, at 242, 96 S. Ct. at 2547.

"The Court also stated:

'Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.'

. . . .

'[T]o hold as we are urged to do that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.' *Meachum v. Fano*, supra, 427 U.S. at 225, 96 S. Ct. at 2538. (Emphasis original).

Thus, the Court held that the federal Constitution does not, of itself, make a state prisoner's freedom from transfer to administrative segregation a protected liberty interest, but that such an interest may be created by state law. And when a protected liberty entitlement has been created by the State, the Due Process Clause insures that the right is not arbitrarily abrogated. *Meachum v. Fano,* supra; *Wolff v. McDonell,* supra; *Bills v. Henderson,* 631 F.2d 1287 (6th Cir. 1980).

"These state-created liberty interests may be derived from state statute, administrative rules or established practice. In the area of entitlements claimed by prison inmates, it has been held that liberty interests may be established by prison policy statements and regulations. *Bills v. Henderson,* supra; see also, *Twyman v. Crisp,* 584 F.2d 352 (10th Cir. 1978)." 526 F. Supp. at 874-75.

The regulations in place at the time of the *Jones* decision have been modified to respond to the holding in *Hewitt* and, in our view, now recognize a liberty interest in not being placed arbitrarily in administrative segregation by using mandatory language and providing procedures for review which, if exercised, provide sufficient due process. Kansas does not have, however, a regulation which limits the time for an investigation to end or a release requirement if no behavior violation is found.

In addition, the record reflects that Gray at times refused to appear when hearings were held and did not submit statements when given the opportunity to do so.

In this case, the facts show that Gray was afforded the minimal due process required by *Hewitt*. Gray received an ASR on January 6, shortly after his initial placement. This ASR noted that a pre-segregation hearing had been conducted. On January 7, Gray was present at an ASRB hearing reviewing his placement. On January 8, another ASR was issued which gave additional reasons for Gray's administrative segregation placement.

Not only does the conduct of the prison officials here meet *Hewitt's* minimal due process requirements, but, under the facts of this case, Gray's petition does not allege conduct which overcomes the hurdle set by *Swisher,* 12 Kan. App. 2d 183. The conduct by prison officials here is not "of such a nature as to clearly infringe upon constitutional rights, . . . [or] of such character or consequence as to shock the general conscience, or . . . [appear] intolerable to fundamental fairness." 12 Kan. App. 2d at 184.

Gray's petition fails to allege treatment in violation of *Hewitt*'s minimal due process requirements and fails to specifically allege the constitutional mistreatment required under *Swisher*. He received ongoing reviews, and all recommendations of the ASRB were reviewed by the warden. Under these facts, we find no error in dismissing Gray's petition.

Affirmed.