No. 74,170

VERNON J. AMOS, *Appellant*, v. MICHAEL A. NELSON, WARDEN, EL DORADO CORRECTIONAL FACILITY; ROBERT J. HENDRICKS, CAPTAIN OF INVESTIGATION AND INTELLIGENCE; ROBERT L. KECKLER, UNIT TEAM MANAGER B-CELL HOUSE; and DEANE W. DONLEY, UNIT TEAM COUNSELOR B-CELL HOUSE, *Appellees.*

(923 P.2d 1014)

Opinion filed August 16, 1996.

*Steven C. Sherwood*, of Legal Services for Prisoners, Inc., of El Dorado, argued the cause and was on the brief for appellant.

*Julie Riddle*, special assistant attorney general, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: An inmate confined in administrative segregation at a state correctional facility filed a petition for a writ of habeas corpus claiming his placement in administrative segregation violated due process and equal protection. The district court found that an inmate has no liberty interest in the administrative regulations, dismissed the petition, and assessed a $25 fee against the inmate for the filing of the action. The Court of Appeals affirmed the dismissal and assessment of costs in an unpublished decision filed January 12, 1996. This court granted the inmate's petition for review.

Plaintiff Vernon J. Amos is currently incarcerated at El Dorado Correctional Facility (EDCF). He has been placed in administrative segregation at EDCF since his transfer to that facility on April 7, 1994. Amos claims his placement in administrative segregation violates his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution.

Prior to entering the Kansas Department of Corrections (DOC), Amos was confined in the Wyandotte County jail for trial on felony charges. While confined, Amos committed numerous violations of prison rules and regulations, including assaulting staff members, threatening and intimidating behavior, disruptive behavior, fighting, disobeying orders, possessing contraband, gambling, and encouraging group demonstrations. Amos was listed by the jail officials as a member of a gang and a habitual disciplinary problem.

Amos was transferred to the custody of the DOC's Topeka Correctional Facility (TCF) on March 4, 1994. His DOC commitment was based upon aggravated escape and robbery convictions. Extensive documentation listing Amos' 12 violations of rules and regulations during January and February 1994 at the Wyandotte County jail was provided to TCF. Based on this information the DOC placed Amos in administrative segregation under K.A.R. 44-14-302(f) and (g) on March 4, 1994, for exhibiting consistent bad behavior and posing both a security and escape risk. The DOC

records note that Amos was "interviewed prior to placement in seg." Amos acknowledged receipt of the segregation report on March 4, 1994, and requested a hearing. On April 7, 1994, Amos was transferred to EDCF. Thereafter, he received weekly reviews of his segregation status on April 8, 13, 19, and 26, 1994; on May 4, 1994; and thereafter, on a monthly basis.

On November 8, 1994, Amos filed a petition for a writ of habeas corpus (K.S.A. 60-1501) in the Butler County District Court alleging that his placement in administrative segregation by the DOC was without legal or just cause and was cruel and unusual punishment in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Amos alleged that after being "interviewed," he was placed in administrative segregation without a hearing and then denied the hearings required by K.A.R. 44-14-311 after his placement. Amos asserted his placement in administrative segregation violated the regulations governing equal treatment of all inmates, deprived him of a liberty interest without due process, and violated the constitutional prohibition against double jeopardy.

The EDCF asserted that Amos had no protected liberty interest in avoiding administrative segregation and, therefore, no due process or equal protection rights were violated. The EDCF argued that the discretionary functions of DOC officials are subject to judicial review only for clear abuse. The EDCF asked that the inmate's petition be dismissed because Amos had failed to show a clear abuse of discretion in his placement in administrative segregation.

In agreeing with the EDCF, the district judge noted:

"Plaintiff's case stands or falls upon the legal question of whether or not Kansas regulations governing administrative segregation create a liberty interest, which is required for any due process claim. Without a liberty interest, plaintiff's claims simply have no constitutional foundation and it matters not whether he had certain hearings or not.

"This Court is of the opinion that the Kansas regulations governing such segregation do not create a protected liberty interest. To create such interests, state regulations must use both mandatory language to limit discretion and require a particular result. The Kansas regulations on administrative segregation do not

contain such necessary language. See *Dotson v. Maschner*, 764 F. Supp. 163 (D. Kan. 1991). Plaintiff has not been deprived of any liberty interest."

The district judge then concluded:

"To avoid summary dismissal of a habeas corpus petition, allegations must be made of shocking and intolerable conduct or continuing mistreatment of a constitutional nature. *Swisher v. Hamilton*, 12 Kan. App. 2d 183, Syl. ¶ 1, 740 P.2d 95, *rev. denied* 242 Kan. 905 (1987). As noted above, no constitutional rights have been abrogated. Additionally, the Court sees nothing in the circumstances set forth herein that shock the conscience or amount to intolerable conduct.

"As to plaintiff's double jeopardy claims, it should be noted that double jeopardy protection applies to multiple criminal prosecutions for the same act. Administrative segregation procedures are not criminal prosecutions."

The district judge found that the files and records of the case conclusively showed that Amos was not entitled to relief, dismissed the petition for failure to state a claim, and assessed "court costs" of $25 pursuant to K.S.A. 60-1505(a).

Amos appealed, challenging the dismissal of his petition for a writ of habeas corpus and the assessment of court costs. In an unpublished decision, the Court of Appeals, in affirming the district court, followed *Davis v. Finney*, 21 Kan. App. 2d 547, 902 P.2d 498 (1995). *Davis*, which dealt with an inmate's placement in disciplinary segregation, held that there is no review of a claim of a due process violation concerning placement in administrative or disciplinary segregation unless (1) the state law and regulations governing the authority of prison officials contain language of an unmistakably mandatory character and (2) the discipline imposed is a significant and atypical hardship on the inmate of a nature not contemplated in the conditions of the original sentence. 21 Kan. App. 2d 547, Syl. ¶ 1. The Court of Appeals in the present case concluded that because there was no showing that an inmate's placement in administrative segregation was a significant and atypical hardship not contemplated in the conditions of the original sentence, the district judge had properly dismissed Amos' petition and affirmed the judge's assessment of court costs. This court granted Amos' petition for review.

Scope of Review

Judicial review of agency actions is governed by the Act for Ju-

dicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* The Act creates only procedural rights and imposes only procedural duties. K.S.A. 77-603(b). The Act does not apply to agency actions concerning the management, discipline, or release of persons in the custody of the Secretary of Corrections. K.S.A. 77-603(b)(2). Therefore, the scope of our review is limited to questions of law.

Does Amos have a protected liberty interest, *i.e.*, a due process right in avoiding placement and retention in administrative segregation? Before discussing the issue, it will be helpful to review the regulations governing the placement of inmates in administrative segregation.

### Segregation Regulations

Each correctional institution and facility is required to establish a set of procedures designated as security segregation procedures. Those procedures are: (a) administrative segregation, including protective custody and medical segregation; and (b) disciplinary segregation. K.A.R. 44-14-102. The minimum standards for segregation of an inmate for disciplinary or administrative segregation are set out in K.A.R. 44-14-101.

### Disciplinary Segregation

Disciplinary segregation is a procedure in which an inmate's privileges and certain rights are restricted or removed for punishment in order to maintain discipline in the correctional facilities. The purpose of disciplinary segregation is to incarcerate for punishment inmates currently serving a sentence as meted out by the disciplinary board and approved by the principal administrator. K.A.R. 44-14-201(b). No inmate shall, under any condition except those set out in the regulations, be placed in a disciplinary segregation unit unless all of the requirements of the disciplinary procedure have been met. K.A.R. 44-13-101 *et seq.* It is important to note that even though disciplinary procedure regulations, which set timelines for action and appeals by the inmate, use the word "shall," K.A.R. 44-13-705 states: "Failure to meet deadlines required in the review and appeal process may result in the dismissal of the appeal at the discretion of the reviewing authority." The

classification of offenses and penalties is set out in K.A.R. 44-12-1301 *et seq*. The penalty for an offense may include disciplinary segregation, loss of good time credits, and a fine not to exceed $20. The maximum sentence of disciplinary segregation for all violations arising out of one incident cannot exceed 60 days. K.A.R. 44-12-1308.

## Administrative Segregation

Administrative segregation procedures are established for control of inmates for necessary administrative purposes other than punishment. The various reasons inmates may be confined for administrative segregation are stated in K.A.R. 44-14-302. Amos' initial placement in administrative segregation resulted from consistent bad behavior during incarceration and from his status as a substantial threat to the safety and security of the facility. Under the regulations, an inmate "may" be confined in administrative segregation for engaging in consistent bad behavior as evidenced by three documented instances of bad behavior within the preceding 12 months if the instances arise from separate fact situations and cause a substantial threat to the safety and security of the facility. Placement for this reason requires prior written approval of the principal administrator. K.A.R. 44-14-302(f). An inmate also "may" be confined in administrative segregation under the category of "other security risk" if the inmate engages in behavior which threatens security or control in the facility. If an inmate is placed in administrative segregation for behavior which threatens security or control in the facility, the principal administrator shall, in writing, explain the threat to security and show justification for segregation. K.A.R. 44-14-302(g).

If an inmate is to be placed in administrative segregation, certain procedural requirements arise. Unless an emergency situation is documented, "inmates placed in segregation shall be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations or reasons as to why such a placement should not be effected." K.A.R. 44-14-303(b). Further, an administrative segregation report shall be completed, indicating specifically the reason for placing the inmate in admin-

istrative segregation. K.A.R. 44-14-304(a). The inmate shall receive written notice of the reasons for placement in administrative segregation before the placement occurs, unless an emergency exists. This notice must be given to the inmate before the hearing is held so the inmate knows the reasons for the placement. K.A.R. 44-14-305.

Each DOC institution has an administrative segregation review board (ASRB). K.A.R. 44-14-309. The ASRB interviews the inmate and holds an initial hearing within 3 working days of the placement to review the inmate's placement in administrative segregation. This requirement applies to every case of administrative segregation. K.A.R. 44-14-310(a). At the hearing, the inmate shall be given an opportunity to present his or her case. K.A.R. 44-14-310(b). Thereafter, the ASRB reviews the status of each inmate confined in administrative segregation. Reviews shall occur every 7 days for the first 2 months of segregation and at least every 30 days thereafter. K.A.R. 44-14-311(a). At each review, the ASRB makes a recommendation that the inmate be continued in administrative segregation or that other action be taken. K.A.R. 44-14-311(b), (c). The inmate shall be permitted to submit a written request for release to the ASRB. K.A.R. 44-14-311(d). An inmate placed in administrative segregation may be transferred to another facility. Unless released from administrative segregation status by the principal administrator of the transferring facility prior to transfer, the inmate shall be held on the same status pending the next regularly scheduled review by the ASRB of the new facility. K.A.R. 44-14-318(a), (b). An initial appearance before the ASRB of the new facility is not required unless no appearance was held before the ASRB of the transferring facility due to a serious emergency or a major disturbance. K.A.R. 44-14-318(c).

## Liberty Interest

Amos argues that he was denied his constitutional due process rights by being placed in administrative segregation. The Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property without due process of law. There is no requirement of constitutional due

process unless a protected liberty interest is involved. Thus, the issue is whether Amos has a protected liberty interest in avoiding administrative segregation.

The limited range of liberty interests afforded by the Fourteenth Amendment to prison inmates arises from two sources: (1) the Due Process Clause itself and (2) the laws of the states. *Hewitt v. Helms*, 459 U.S. 460, 466, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983). In applying a test set out in *Hewitt* to determine if an interest was involved, a split of authority emerged in the Court of Appeals as to whether Kansas regulations concerning administrative segregation create a protected liberty interest. In *Gray v. Nelson*, 20 Kan. App. 2d 900, 893 P.2d 842 (1995), decided April 14, 1995, the Court of Appeals determined that the regulations concerning administrative segregation created a protected liberty interest. The *Gray* court stated:

"It is inherent in the nature of the management of penal institutions that the initial discipline or administrative segregation will be a disciplinary function based upon the judgment of a correctional officer. Once that decision is made in Kansas . . ., a host of mandatory procedures instantly attach to the process which require notifications, written reports, and continued periodic hearings for as long as an individual is in administrative segregation." 20 Kan. App. 2d at 905-06.

Noting the similarities between the Kansas regulations and those in *Hewitt*, the *Gray* court held that " 'the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates' demands our conclusion that Kansas has created a protected liberty interest." 20 Kan. App. 2d at 906. However, *Gray* nonetheless affirmed the dismissal of the inmate's petition for habeas corpus because due process was followed and the inmate had failed to allege continuing mistreatment of a constitutional nature or conduct that was shocking or intolerable.

The opposite conclusion was reached by a separate panel of the Court of Appeals in *Graham v. Nelson*, 20 Kan. App. 2d 896, 893 P.2d 294 (1995), also decided on April 14, 1995. The *Graham* court reasoned that although the regulations governing administrative segregation mandated procedural safeguards when an inmate was placed in segregation, the decision whether to place the inmate in administrative segregation was an executive function left to the

discretion of the facility administrator. 20 Kan. App. 2d at 898. The *Graham* court found that the regulations did not contain necessary mandatory language and, thus, no liberty interest was created. 20 Kan. App. 2d at 899. In reaching its conclusion, the *Graham* court relied on *Dotson v. Maschner*, 764 F. Supp. 163 (D. Kan. 1991), which held that Kansas administrative segregation regulations do not create a protected liberty interest since they contain no mandatory language which limits the discretion of prison officials. 764 F. Supp. at 166. The *Graham* court concluded that because the operation of penal institutions is an executive function, the conduct challenged must clearly show an infringement of a constitutional right, shock the general conscience, or be intolerable to fundamental fairness. 20 Kan. App. 2d 896, Syl. ¶ 2.

It is helpful to review the federal case law concerning state-law created liberty interests existing at the time the two panels of the Court of Appeals reached contrary results. *Hewitt v. Helms*, 459 U.S. 460, involved the placement of an inmate in administrative segregation following a prison riot. Although the *Hewitt* Court noted the Due Process Clause itself did not give rise to a protected liberty interest in remaining in the general prison population, the Court held that Pennsylvania state law created a liberty interest. 459 U.S. at 470-71. The Court reasoned that the Pennsylvania state regulations used "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" and that the regulations required "that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.' " 459 U.S. at 471-72. Although the *Hewitt* Court found the state's statutory framework governing administrators of its prisons gave rise to a liberty interest, it held the administrative process afforded the inmate due process.

*Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 104 L. Ed. 2d 506, 109 S. Ct. 1904 (1989), concerned Kentucky regulations governing prison visits. Although Kentucky generally had an open visiting policy, the visitation regulations provided a nonexhaustive list of specific reasons for excluding visitors and permitted denial of entry of a visitor if the visitor's presence would

constitute a "clear and probable danger to the safety and security of the institution or would interfere with the orderly operation of the institution." 490 U.S. at 457. The *Thompson* Court applied the *Hewitt* test but determined that, although the Kentucky regulations created substantive predicates placing limitations on the discretion used to determine visitation, the regulations lacked the relevant mandatory character necessary to create a liberty interest. 490 U.S. at 463-64. The Court noted that the regulations stopped short of requiring that a particular result follow upon a finding that the substantive predicates had been met. Specifically, visitors who fell into certain categories could be excluded but did not have to be. 490 U.S. at 464.

As enunciated in *Hewitt* and followed in *Thompson*, the test for determining whether state regulations give rise to a due process liberty interest is whether those regulations place limitations on the use of discretion by prison officials in the form of substantive predicates, and whether those regulations use mandatory language which provides that when the substantive predicates are either met or not met, certain actions must follow. See *Thompson*, 490 U.S. at 462-63. This test was applied in *Shepherd v. Davies*, 14 Kan. App. 2d 333, 789 P.2d 1190 (1990), which held that disciplinary segregation regulations created a protected liberty interest. See also *Goddard v. Kansas Dept. of Corrections*, 16 Kan. App. 2d 408, 824 P.2d 991 (1992) (applying the same test and holding that regulations regarding recommendations for sentence modification did not create a protected liberty interest.)

The split in the Court of Appeals in *Graham* and *Gray* appears to have arisen when applying *Hewitt* to the regulations because the panels interpreted differently the discretion allowed prison officials: *Graham* focused on the discretionary language concerning when administrative segregation "may" be imposed, whereas *Gray* focused on the fact that once the decision is made to place an inmate in administrative segregation, certain mandatory procedures "shall" be followed.

After reviewing the two decisions, we note that there is support for the conclusions reached in both *Graham* and *Gray* based on the rationale of *Hewitt* and the Kansas administrative segregation

regulations. However, because the United States Supreme Court recently narrowed the application of the *Hewitt* standard for determining whether federal or state prison regulations give rise to a protected liberty interest in *Sandin v. Conner*, 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995), we will review *Sandin*. The holding in *Sandin* represented a major departure by the Court from the *Hewitt* test.

In *Sandin*, an inmate alleged he was denied due process in connection with a disciplinary hearing. The district court granted the prison official's motion for summary judgment. The Ninth Circuit Court of Appeals applied the *Hewitt* test, concluded that the Hawaii prison regulations governing disciplinary segregation gave rise to a protected liberty interest, and reversed the district court. The United States Supreme Court opined that the *Hewitt* approach produced at least two undesirable effects. First, *Hewitt* created disincentives for States to codify prison management procedures in the interest of uniform treatment of inmates. Second, *Hewitt* led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources without any actual benefit. 515 U.S. at 482. The *Sandin* Court abandoned *Hewitt's* methodology and returned to the due process principles established by prior cases. While still recognizing that states may, under certain circumstances, create liberty interests which are protected by the Due process Clause, the *Sandin* Court stated that those interests "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-84. Applying this test to the Hawaii regulations, the *Sandin* Court reversed, holding that since disciplinary segregation did not present a dramatic departure from the basic conditions of the original sentence imposed, no liberty interest was created. 515 U.S. at 486-88.

The rationale of *Sandin* was applied by the Kansas Court of Appeals in *Davis v. Finney*, 21 Kan. App. 2d 547, 902 P.2d 498 (1995). As in *Sandin*, *Davis* concerned disciplinary segregation regulations. The *Davis* court determined that the inmate had no protected liberty interest in avoiding placement in disciplinary segre-

gation because the segregation did not represent a significant and atypical hardship on the inmate not contemplated within the realm of conditions of the original sentence. 21 Kan. App. 2d at 558-59. In reaching its conclusion, the *Davis* court set out a two-step analysis, applying *Hewitt* as the first step and *Sandin* as the second. The *Davis* court indicated that the two-step analysis applies both to disciplinary and administrative segregation.

Because of the split of authority in the Court of Appeals' decisions and the United States Supreme Court's subsequent decision in *Sandin*, this court heard *Murphy v. Nelson*, 260 Kan. 589, 921 P.2d 1225 (1996), to resolve the conflict. *Murphy* was filed on July 26, 1996. In that case, Murphy sought injunctive relief, alleging he was illegally restrained in administrative segregation without legal justification, in violation of the Fourteenth Amendment. At the hearing, the evidence established that Murphy was one of a number of inmates who had been placed in administrative segregation pending an investigation of an inmate uprising that resulted in the death of a corrections officer. In order to avoid jeopardizing the resulting criminal cases, no disciplinary proceedings had been initiated. Some inmates who were initially segregated had been tried and convicted while Murphy continued to be held in administrative segregation pending investigation.

The district court held that, by holding Murphy in administrative segregation, the warden had acted beyond his authority. The court reasoned that the regulation on which the warden relied, K.A.R. 44-14-302(g), permits administrative segregation only if the inmate engages in behavior threatening to the security or control of the prison. In addition, the district court faulted the failure to provide the ASRB with necessary information so it could make a meaningful decision as to the justification or lawfulness of retaining Murphy in administrative segregation for investigation. The district court ordered Murphy's immediate release from administrative segregation and his return to the general population. The warden appealed. The appeal was transferred to this court by our order of February 20, 1996.

We observed in *Murphy* that the constitutional procedural due process analysis is a two-step procedure in which the court must

first determine whether due process is involved and, if it is, then the court must determine the nature and extent of the process which is due. 260 Kan. at 597-98 (citing *Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Com'rs*, 811 F.2d 1371, 1375 [10th Cir. 1987]; *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 354, 770 P.2d 443 [1989]).

We noted that first, due process violations can be established only if the inmate is able to show that he or she was denied a specific entitled procedural protection. Then, the appropriate procedural protection that must accompany a deprivation of a particular liberty interest is resolved by a balancing test, which weighs the individual loss at stake, the risk of erroneous deprivation, and the State's interest in the procedures used. 260 Kan. at 598-99. We next observed that the importance of *Sandin* is its pronouncement as to how a court should determine whether an inmate has a protected liberty interest in some type or condition of confinement. 260 Kan. at 599. We held that subsequent to *Sandin*, Kansas regulations need not follow the strict test of *Hewitt*. 260 Kan. at 599. We concluded that the administrative regulations in Kansas governing correctional segregation "compel a holding, as a matter of law, that administrative segregation does *not* represent a significant and atypical hardship on the prisoner in relation to the ordinary incidents of prison life." 260 Kan. at 602.

Returning to the instant case, Amos argues that the Court of Appeals incorrectly interpreted and then improperly applied *Sandin* in *Davis*. He asserts that *Davis* erroneously changed the mandate of *Sandin*. He contends that while *Sandin* set forth the standard which imposes atypical and significant hardship on the inmate in relation to "the ordinary incidents of prison life," the *Davis* court decreed the standard to be a significant and atypical hardship on the prisoner which is not contemplated "within the realm of conditions of the original sentence."

We do not find a distinction or a difference in the terms "ordinary incidents of prison life" and "within the realm of conditions of the original sentence." This claim is without merit.

Amos also argues that the *Sandin* rationale applies only to disciplinary segregation and not to administrative segregation. This argument is not persuasive. Disciplinary segregation is more invasive and sets stricter limitations on inmates' privileges than does administrative segregation. If consideration of whether atypical and significant hardships occur is relevant to the question of whether disciplinary segregation regulations give rise to a liberty interest, it is also relevant to the same question in the context of administrative segregation.

Amos' final argument is that administrative segregation imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. However, K.A.R. 44-14-306 states:

"Each inmate in administrative segregation shall be treated as nearly as possible like any other inmate in the general population of the institution or facility. When possible, the inmate shall retain such privileges and property as are commensurate with the particular circumstances or condition for which the inmate was placed in administrative segregation. Administrative segregation shall not be used or considered as punishment."

Additionally, EDCF guidelines do not place atypical and significant hardships on inmates placed in administrative segregation. Inmates must be provided all prescribed medications, clothing that is not degrading, and access to basic personal items unless there is a clear and present danger that inmates will destroy such items or use them to injure themselves or others. Inmates confined to segregation also receive the same meals as the general prison population except in certain circumstances involving their behavior or for religious or medical reasons. Inmates in segregation have access to reading materials, hair care services, telephone privileges, and linen and clothing on the same basis as inmates in the general population, as well as personal legal materials, legal reference materials, the opportunity to shower and shave three times per week, the same communication privileges as inmates in the general population, visitation "in accordance with GO 16-107" (not defined in the record on appeal), and exercise periods outside their cells a minimum of 1 hour per day, 5 days per week. Inmates in disciplinary segregation have additional restrictions relating to television privileges, reading materials, canteen privileges, telephone privi-

leges, and tobacco privileges. Unlike inmates confined to disciplinary segregation, those in administrative segregation have access to the commissary, social and counseling services, religious guidance, recreation, educational services, telephone privileges, reading materials, legal services, and personal property.

To summarize, Kansas courts will not review an inmate's claim that he or she was placed in either administrative or disciplinary segregation unless the Due Process Clause has been violated. The threshold test to determine a violation of due process is whether the state laws and regulations structuring the authority of prison officials contain language of an unmistakably mandatory character requiring that certain procedures must be employed and that punishment will not occur absent specified substantive predicates. If this threshold test is met, we examine whether the discipline imposed represents a significant and atypical hardship on the prisoner which was not contemplated within the realm of conditions of the original sentence. If it does not, there is no due process violation. See *Davis v. Finney*, 21 Kan. App. 2d at 558-59.

Our analysis of Amos' claim of hardship associated with administrative segregation does not reflect the kind of atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life necessary to establish a protected liberty interest. Therefore, under such circumstances Amos has no protected liberty interest in avoiding placement in administrative segregation. Because Amos has no protected liberty interest in avoiding placement in administrative segregation, there was no violation of due process, and he is not entitled to habeas corpus relief. The district court did not err in dismissing Amos' claim, because under no set of facts would Amos be entitled to relief.

## Assessing Costs

In its order dismissing Amos' petition, the district court assessed $25 in court costs pursuant to K.S.A. 60-1505(a). That statute states in part that "[i]f the plaintiff is an inmate in the custody of the secretary of corrections and the motion and the files and records of the case conclusively show that the inmate is entitled to no relief, the writ shall be dissolved at the cost of the inmate."

· Because of the opposite conclusions reached by separate panels of the Court of Appeals in *Gray* and *Graham,* it cannot be conclusively shown that Amos' claim had no merit. The circumstances allowing assessment of costs to the inmate did not arise here.

Affirmed in part and reversed in part.

LARSON, J., concurring: I concur in the result reached by the majority as well as much of the reasoning of its opinion. I write separately only because I do not believe we should, in a case involving administrative segregation, set down rules which would govern and apply to disciplinary segregation as well.

I would not reach or make the analysis herein that the majority has made of *Davis v. Finney,* 21 Kan. App. 2d 547, 902 P.2d 498 (1995).

I view the holding in *Davis,* 21 Kan. App. 2d 547, Syl. ¶ 1, that

"Kansas courts will not review an inmate's claim that he or she was placed in either administrative or disciplinary segregation in violation of due process of law unless: (1) the state law and regulation structuring the authority of prison officials contain language of an unmistakably mandatory character requiring certain procedures to be employed and the punishment will not occur absent specified substantive predicates, and (2) the discipline imposed represents a significant and atypical hardship on the prisoner which is not contemplated within the realm of conditions of the original sentence."

as representing a continuation of the *Hewitt v. Helms,* 459 U.S. 460, 468, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983), test and adding thereto the *Sandin v. Conner,* 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995), "atypical and significant hardship" test.

I read *Sandin* as abolishing the test of *Hewitt* stated in Syl. ¶ 1 of *Davis,* which the majority has continued herein. In a disciplinary segregation case, I believe our analysis must follow the direction of the *Sandin* majority opinion, which stated:

"In light of the above discussion, we believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also *Board of Pardons v. Allen,* 482

U.S. 369[, 96 L. Ed. 2d 303, 107 S. Ct. 2415] (1987). But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, *e.g.*, *Vitek*, 445 U.S., at 493[, 63 L. Ed. 2d 552, 100 S. Ct. 1254] (transfer to mental hospital), and *Washington*, 494 U.S., at 221-222[, 108 L. Ed. 2d 178, 110 S. Ct. 1028] (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-84.

We have not carefully reviewed and applied *Meachum v. Fano*, 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) or *Wolff v. McDonnell*, 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974), which should be the guideposts in a determination of whether a Kansas inmate has a liberty interest in being free from disciplinary segregation. Although I agree a Kansas inmate has no liberty interest in remaining free of administrative segregation, I believe the differences in administrative and disciplinary segregation mandate that our holding in this case should be limited to administrative segregation.

I would not approve of the dual and conjunctive tests of *Davis*, as the majority has done, and would reach issues involving disciplinary segregation only when properly raised and briefed in a case involving the invocation of disciplinary segregation in Kansas.

SIX, J., joins in the foregoing concurring opinion.