No. 46,390

John L. Levier, *Appellant*, v. State of Kansas, Robert W. Woodson, Penal Director, Arthur J. Huggins, Deputy Warden, Kansas State Penitentiary, Lansing, Kansas, *Appellees*. No. 46,391. James T. Levier, *Appellant*, v. State of Kansas, Sherman H. Crouse, Warden, Kansas State Penitentiary, Lansing, Kansas, *et al.*, *Appellees*.

(497 P. 2d 265)

Opinion filed May 6, 1972.

*Edward J. Chapman, Jr.*, of Leavenworth, argued the cause and was on the briefs for the appellants.

*Patrick J. Reardon,* county attorney, argued the cause, and *Vern Miller,* attorney general, and *John A. Price,* special prosecutor, were with him on the briefs for the appellees.

The opinion of the court was delivered by

HARMAN, C.: These appeals are from orders summarily denying inmates of the state penitentiary an evidentiary hearing or any relief on alleged grievances arising out of their imprisonment.

The two actions were dealt with separately in the trial court and on appeal were docketed separately in this court. However, we deem it appropriate to consolidate the two actions for the purpose of this opinion inasmuch as the facts in each case are so similar as to raise the same issues of law, the adverse parties are each represented by the same counsel and the appeals were by agreement consolidated for oral argument before this court.

Each proceeding was initiated by the *pro se* filing in the trial court of a lengthy hand written instrument denominated "Petition For Writ of Habeas Corpus Ad Testificandum". Appellant James filed his petition February 5, 1970—that of appellant John was filed May 22, 1970. In James' case a writ of habeas corpus was promptly issued to the warden of the penitentiary, in response to which James was produced in open court on February 20, 1970, at which time after certain colloquy between the prisoner and the trial court the latter dismissed the action. John's action was dismissed the same day it was filed. In neither instance was counsel appointed.

Neither appellant questions the legality of the sentence under which he is confined but each complains of the manner in which he has been treated while confined under it. From their petitions it appears that each appellant has undergone solitary confinement in what is known as the adjustment and training building (A & T) within the confines of the penitentiary.

James has been continuously confined at the A & T since March 30, 1966. This confinement has been at his own request, under what is known as protective custody status, because he once testified against fellow inmates in a trial arising out of a prison homicide and is in fear of his life if placed at large among the prison population. Highly summarized, James complains of denial of medical treatment and proper diet for stomach ulcers he has developed and lack of exercise or work facilities and rehabilitation programs, for all of which he has repeatedly asked as provided under the prison

rules and regulations for inmates. He alleges this constitutes inhumane and cruel treatment and his prayer is for appointment of counsel and an evidentiary hearing and either transfer to another suitable penal institution or release from confinement.

An answer was filed in James' action on behalf of the penal authorities. Briefly it alleges that in 1964 James had been transferred to the reformatory but was uncooperative there and was reincarcerated at the penitentiary. The answer also alleges habeas corpus is an improper remedy and that a proper one would be a civil action for damages or some form of injunctive relief. The answer also pleads the "hands-off" doctrine.

John's petition alleges he has been incarcerated in the A & T building for periods of time ranging from fourteen to 122 days, once for investigation of robbery, once upon trumped-up charges and once upon investigation of fighting; that when he was suffering from self-inflicted wounds he was denied medical attention for a long period of time and finally received incompetent treatment at the hands of an inexperienced inmate nurse; that while confined in A & T he was sprayed by guards with a high pressure water hose which bruised his body and was compelled for three weeks to sleep without adequate clothing on a flooded concrete floor while the air cooling system was operating. He complains also of the food, light, and exercise and sanitation facilities supplied in the A & T building.

In dismissing James' action the trial court stated the petition did not state a claim upon which relief could be granted.

In John's action the trial court, without appearance by anyone, entered an order of dismissal the same day the petition was filed, stating there was no basis for the issuance of a writ on the facts alleged and further that the petitioner had an appeal to this court in another habeas corpus action, referring to it by number (the trial court appears to have been in error as to this appeal as the numbered action referred to is that of James).

Appellees present several arguments here in support of the trial court's action. They assert a proceeding in habeas corpus attacking the conditions of confinement, where the imprisonment is otherwise legal, should not be entertained because traditionally such proceeding is only to inquire into the propriety of the sentence and to order complete release when the sentence is found to be illegal. Appellees suggest actions for damages or for injunctive relief, mandamus or prohibition may be appropriate to insure adherence to legislative

requirements respecting penal conditions. They also in effect assert courts are not equipped to exercise supervision over the manner of treatment of those in confinement and to attempt to do so would frustrate the existing administrative function of the penal authorities to investigate alleged acts of mistreatment. Appellees further urge that the petitions relate to past occurrences which should not now be considered in the abstract because they have been rendered moot by the passage of time.

Appellants point to decisions in other jurisdictions wherein relief has been granted by both state and federal courts to inmates establishing violation of their rights to humane treatment while confined even though such relief has not extended to total release from confinement.

Let us look first at norms which have been established as to the rights of persons confined under conviction of crime.

The infliction of cruel and/or unusual punishment is constitutionally prohibited (U. S. Const. amend VIII; Kan. Const. B of R., § 9).

K. S. A. 21-119, enacted in 1868 and in effect until repealed and superseded July 1, 1970, provided:

"The person of a convict sentenced to confinement and hard labor is under the protection of the law, and any injury to his person not authorized by law shall be punishable in the same manner as if he was not sentenced or convicted."

In *City of Topeka v. Boutwell,* 53 Kan. 20, 35 Pac. 819, an action in part for damages for harsh and cruel treatment allegedly suffered by a prisoner while confined under sentence in a city jail, this court declared:

"It is the duty of all keepers of jails and prisons to treat their prisoners humanely." (p. 32.)

K. S. A. 21-119 was superseded by the enactment of that which is now K. S. A. 1971 Supp. 21-4615, which provides:

"(1) A person who has been convicted in any state or federal court of a crime punishable by death or by imprisonment for a term of one (1) year or longer and is imprisoned pursuant to such conviction shall, by reason of such conviction and imprisonment, be ineligible to hold any public office under the laws of the state of Kansas, or to register as a voter or to vote in any election held under the laws of the state of Kansas or to serve as a juror in any civil or criminal case.

"(2) The disabilities imposed by this section shall attach when the convicted person is delivered to the custody of the state director of penal institutions for imprisonment and shall continue until such person is finally discharged from parole or conditional release or is discharged from custody by reason of

the expiration of the terms of imprisonment to which he was sentenced, except that when a sentence of imprisonment is modified by the court within one hundred twenty (120) days from the date thereof and the convicted person is admitted to probation, such person shall not thereafter be subject to the disabilities imposed by this section.

"(3) The disabilities imposed upon a convicted person by this section shall be in addition to such other penalties as may be provided by law."

The Judicial Council which drafted the foregoing provision as a part of our present criminal code had this to say respecting it:

"Under existing Kansas statutes a prisoner serving sentence for a term of years loses 'all civil rights—during the term thereof, and forfeits all public offices and trusts, authority and power.' A person sentenced to life term 'shall thereafter be deemed civilly dead.' (K. S. A. 21-118). Convicts serving a term of years retain the right and power to make contracts concerning their property. (K. S. A. 21-134). On the other hand, confinement in the penitentiary either for a term of years or for life suspends the convicts' rights to sue (*Hammet v. San Ore Construction Co.*, 195 Kan. 122). In other areas, the status of the inmates' rights is less clear.

"Under the proposal, the convicted person who is confined to prison loses his right to hold public office or employment, his right to vote and his right to be a juror. Otherwise, his civil rights will remain intact, excepting of course, those rights that must be limited in order to make his imprisonment effective. . . ." (Kansas Judicial Council Bulletin, April, 1968, Special Report, p. 136.)

### K. S. A. 1971 Supp. 21-3425 provides:

"Mistreatment of a confined person is the intentional abuse, neglect or illtreatment of any person who is physically disabled or mentally ill or whose detention or confinement is involuntary, by any law enforcement officer or by any person in charge of or employed by the owner or operator of any correctional institution or any public or private hospital or nursing home.

"Mistreatment of a confined person is a class A misdemeanor."

K. S. A. 76-2404 makes it the duty of the director of penal institutions to examine into all matters connected with the government, discipline and police of the penitentiary and to inquire into any misconduct which may be alleged to have been committed by any officer of the penitentiary. The director is also charged with adoption of rules and regulations for the direction and government of the penitentiary.

K. S. A. 76-2406 prescribes duties of the warden including the duty to examine daily into the state of the penitentiary and the health, conduct and safekeeping of the prisoners.

### K. S. A. 76-2423 provides:

"There shall be no corporal punishment, and no painful and unusual kinds of punishment inflicted, such as binding the limbs or any member thereof, or

placing and keeping the person in painful posture; and that the punishment of delinquent prisoners shall be restricted to the ball and chain, but so used as not to torture the person or limbs, and to close and solitary confinement, with such deprivation of light and such limitation in kind and quality of food as may, in the exercise of a sound discretion, produce distress without hazarding the life of the offender."

Finally at its 1972 session the legislature enacted, and the governor signed, that which has become known as the Penal Reform Act (HB No. 2030) to become effective from and after July 1, 1974. The act transfers the duties and functions of the director of penal institutions to the office of secretary of corrections which is created by the act, while the title of the chief officer of the penitentiary is changed from that of warden to director.

Section 1 of the act provides:

"The legislative purpose in enacting this act shall be deemed to be establishment of a policy of treatment of persons convicted of felonies in this state by placing maximum emphasis on rehabilitation of each such person while in the custody of the state or under the jurisdiction of the courts of the state, consistent with the interests and safety of the public, so that a maximum of persons so convicted may be returned to private life in the communities of the state with improved work habits, education, mental and physical health and attitudes necessary to become and remain useful and self-reliant citizens. It is the intent of the legislature that district judges, the secretary of corrections, his agents, subordinates and employees and the Kansas adult authority, its agents, subordinates and employees will construe and apply this act and acts of which it is amendatory or supplemental liberally to rehabilitate, train, treat, educate and prepare persons convicted of felony in this state for entry or reentry into the social and economic system of the community upon leaving the custody of these state agencies and officers."

Section 11 provides:

"(a) Persons committed to the institutional care of the secretary of corrections shall be dealt with humanely, with efforts directed to their rehabilitation and return to the community as safely and promptly as practicable. . . . The Kansas adult authority shall maintain a comprehensive record of the behavior of each inmate reflecting accomplishments and progress toward rehabilitation as well as charges of infractions of rules and regulations, punishments imposed and medical inspections made. . . .

"(b) The secretary, with the cooperation of the state health department, shall establish and prescribe standards for health, medical and dental services for each institution, including preventive, diagnostic and therapeutic measures on both an out-patient and a hospital basis, for all types of patients. An inmate may be taken, when necessary, to a medical facility outside the institution.

. . . . . . . . . . . . . . .

"(e) The secretary shall prescribe rules and regulations for the maintenance of good order and discipline in institutions, including procedures for dealing with violations. A copy of the rules shall be provided to each inmate."

Section 29 requires the keeping of a record showing all punishment inflicted upon each prisoner and the reason.

Section 30 provides:

"The discipline to be observed in all correctional institutions of the state shall be reformatory, and it shall be the duty of said secretary to maintain such control over all persons committed to his care as shall prevent them from committing crime and best secure their self-support and accomplish their reformation; and to this end said secretary shall adopt such means of reformation as consistent with the improvement of the inmates as he deems expedient. They may be employed in such labor as will best contribute to their support and reformation."

Section 43 requires approval by the state board of health of the institution in which an inmate is incarcerated. Section 44 (*b*) provides for the office of an ombudsman to receive and relay to the secretary of corrections complaints of inmate mistreatment. We have directed attention only to a small portion of the act, which is comprehensive in nature, but enough to indicate that when fully operative the major emphasis is to be on rehabilitation. Thus we see legislative concern as to the rights of prisoners in confinement has been increasingly evinced virtually since statehood.

The essence of the foregoing was well expressed in *Coffin v. Reichard*, 143 F. 2d 443 (6CA, 1944), in the following language:

"A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law. While the law does take his liberty and imposes a duty of servitude and observance of discipline for his regulation and that of other prisoners, it does not deny his right to personal security against unlawful invasion." (p. 445.)

Moreover, we think that such rights include entitlement to adequate food, light, clothing, medical care and treatment, sanitary facilities, reasonable opportunity for physical exercise and protection against physical or psychological abuse or unnecessary indignity—in short, the basic necessities of civilized existence (see A Model Act for the Protection of Rights of Prisoners promulgated by the National Council on Crime and Delinquency, Vol. 18, Crime and Delinquency, No. 1, (Jan., 1972, pp. 1, 10).

We have procured and examined the rules and regulations promulgated by the director of penal institutions and generally it may be said they prescribe standards in accord with the rights just stated. The difficulty here is, according to appellants' allegations, the standards have not been enforced and they have not been afforded those rights. In passing we may state we are aware of no authority hold-

ing that solitary confinement in and of itself constitutes cruel and unusual punishment.

As a matter of elemental justice such rights as an inmate has should not be without an effective means of enforcement. In the absence of adequate administrative procedures inmates should not be denied reasonable access to the courts. However, until comparatively recent times courts have largely adhered to that which has been called the "hands-off" doctrine, which essentially means that courts are without power to supervise prison administration or to interfere with the ordinary prison rules and regulations (see *Banning v. Looney*, 213 F. 2d 771 [10CA, 1954]). This, of course, represents a denial of jurisdiction over the subject matter of petitions from inmates alleging some form of mistreatment or deprivation. This rigid doctrine is a concept which can be fraught with injustice in its application and is one rapidly being abnegated, primarily by way of entertainment of proceedings in habeas corpus where basic rights are alleged to have been invaded. For example in *Coffin v. Reichard*, supra, in which assaults at the hands of guards and co-inmates were alleged, the court ruled that any unlawful restraint of personal liberty may be inquired into by habeas corpus even though the person is in lawful custody. And in *United States v. Kennedy*, 157 F. 2d 811, (2CA, 1946), reversed on other grounds in 332 U. S. 174, 91 L. ed. 1982, 67 S. Ct. 1588, the court speaking through Judge Learned Hand, implicitly endorsed this position when it said:

"We can find no more definite rule than that the writ [of habeas corpus] is available, not only to determine points of jurisdiction . . . but whatever else resort to it is necessary to prevent a complete miscarriage of justice." (p. 813.)

For comprehensive discussion with later citations see Goldfarb and Singer, "Redressing Prisoners' Grievances", 39 Geo. Wash. L. Rev. 175 (1970); also Notes, 19 Kan. L. Rev. 139; Sneidman, "Prisoners and Medical Treatment: Their Rights and Remedies", 4 Crim, L. Bull. 450; "Notes and Comments, Complaints of Convicts", 72 Yale L. Jour. 506.

We hold that under our present code of civil procedure habeas corpus is an appropriate remedy where, as in the case at bar, mistreatment of a continuing or probably continuing nature is alleged, and that anything stated to the contrary in *Phillips v. Hoffman*,

180 Kan. 273, 303 P. 2d 121, can no longer be said to be the law. First of all, K. S. A. 60-102 mandates that the provisions of the code "shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding". Habeas corpus is that kind of remedy. 60-202 provides that there shall be but one form of action to be known as a "civil action". 60-1505 (d), prescribing the judgment which may be entered in a habeas corpus proceeding, states "the court may make such other orders as justice and equity . . . may require". Finally, K. S. A. 60-2606 provides:

"If a case arises in which an action or proceeding for the enforcement or protection of a substantive right, or the redress or prevention of a wrong, cannot be had under any specific provisions of this chapter or other statutes then the court shall proceed as nearly in conformity with the provisions of this chapter as the circumstances permit to do whatever law and equity and justice require for the protection of the parties."

And under K. S. A. 1971 Supp. 22-4506 provision is made for appointment of counsel for a prisoner found to be indigent who files a petition for writ of habeas corpus where the court finds that the petition "presents substantial questions of law or triable issues of fact", such petition to be accompanied by an affidavit that the petition is filed in good faith.

At this point a caveat may be in order respecting the consequences of possible abuse of the writ of habeas corpus by those whose desire is harassment of the officials in charge of our penal institutions or who act irresponsibly. Such warning was well expressed by the Idaho Supreme Court in *Mahaffey v. State*, 87 Idaho 228, 392 P. 2d 279, a habeas corpus action by a penal inmate, in the following:

"Because of the fact that we may not, on an application for a writ of habeas corpus, dispute the veracity of the allegations contained in the petition, it is foreseeable that any number of fabrications could be employed in order that the writ might issue. If such tactics are used, this court will not hesitate to deal harshly, through either its power of contempt or by reference to the proper authorities for prosecution on the charge of perjury, against those who would employ fraud and deceit to win a minor legal victory. Any individual who attempts to make a mockery out of procedures designed to benefit the wronged is tampering with the very foundation of our judicial process and risks having additional punishment imposed." (p. 232.)

It should also be emphasized that prison officials as executive officers of the state are charged with the control and administration of the penal institutions of the state and as such are vested with

wide discretion in the discharge of their duties. Under familiar rules, that discretion should not be interfered with by the courts in the absence of abuse or unless exercised unlawfully, arbitrarily or capriciously. Maintenance and administration of penal institutions are executive functions and it has been said that before courts will interfere the institutional treatment must be of such a nature as to clearly infringe upon constitutional rights, be of such character or consequence as to shock general conscience or be intolerable in fundamental fairness. It has further been said that the "hands-off" doctrine operates reasonably to the extent it prevents judicial review of deprivations which are necessary or reasonable concomitants of imprisonment (see 60 Am. Jur. 2d, Penal and Correctional Institutions, § 45, p. 850). In other words, disciplinary measures properly administered in accord with reasonable prison regulations are not subject to judicial review.

The petitions in the cases at bar do allege deprivations which, if true, go beyond matters of mere discipline. Hence we hold the trial court erroneously denied a hearing on them and the judgments entered must be reversed with directions to appoint counsel for each appellant and to conduct an evidentiary hearing upon the joinder of issues of fact and law in each case in accord with the views herein expressed.

We should emphasize disputed issues of fact respecting mistreatment of inmates should be determined administratively in a grievance procedure wherein the inmate is afforded the basic elements of due process, that is, notice and an opportunity to be heard in an orderly proceeding adapted to the nature of the case (see *Rydd v. State Board of Health*, 202 Kan. 721, 451 P. 2d 239). The particular type of administrative procedure to be employed should be left to the sound discretion of correctional authorities so as to accommodate the needs of the penal system as well as the interests of the inmates. Chief Justice of the United States Warren Burger, who has evinced a special interest in the functioning of corrections as an integral part of the criminal justice system, has recently stressed the need for "a simple and workable procedure by which every person in confinement who has, or thinks he has, a grievance or complaint can be heard promptly, fairly and fully" (Goldfarb and Singer, "Redressing Prisoners' Grievances," *supra*, p. 317). We are not unaware of the difficult and complex problems pressing penal ad-

ministrators for solution within available resources. We recognize that much prison discipline is necessarily peremptory and can scarcely be the subject for administrative review nor will every gripe or complaint be of sufficient gravity to warrant such cognizance.

As indicated, we have examined the regulations prescribed by the director of penal institutions respecting grievances and must conclude they are so vague and ambiguous as to be inadequate for their intended purpose. Appellants here have alleged they have unsuccessfully sought relief at the prison under those regulations. Counsel for appellees have suggested nothing by way of administrative action in response to the complaints made. Until such time as adequate administrative provision is made for an impartial resolution of factual issues underlying such complaints there is no alternative to judicial inquiry respecting the facts rather than limiting judicial review of administrative actions to its ordinary scope. When appropriate administrative procedures have been established then those remedies will be required to have been exhausted prior to resort to the courts.

The judgments are reversed and the actions are remanded for further proceedings heretofore indicated.

APPROVED BY THE COURT.