(902 P.2d 498)
No. 71,876

DERRICK W. DAVIS, *Appellant*, v. JOAN FINNEY, *et al.*, *Appellees*.

—

Opinion filed September 1, 1995.

*Terri L. Harris*, of Lansing, for appellant.

*Linden G. Appel*, special assistant attorney general, of Lansing Correctional Facility, for appellees.

Before BRAZIL, C.J., RULON and GREEN, JJ.

RULON, J.: Derrick W. Davis, petitioner, appeals the district court's denial of his K.S.A. 60-1501 action. First, petitioner argues the court erred in ruling that the failure of prison officials to give him notice of his disciplinary hearing as required by K.A.R. 44-13-401a and K.A.R. 44-13-402 was harmless error. Petitioner further claims he was denied effective assistance of counsel. We affirm.

The undisputed facts reduced to their essence are as follows:

The record shows that petitioner was accused of battery of another inmate. His first hearing was scheduled for October 4, 1993. However, the record shows petitioner did not receive notice because it was delivered to a different inmate with a similar name. The first hearing was continued until October 11 because the reporting officer was unavailable. Petitioner was given notice of the October 11 hearing. However, this hearing was further continued "due to security reasons" and because one or more witnesses were

unavailable. The next hearing date was October 18. Petitioner did not receive advance notice of the hearing, but he was present and lodged a defense.

At the hearing on October 18, the hearing officer found petitioner guilty of the offense alleged. Petitioner was given 45 days' disciplinary segregation and 60 days' restriction of privileges and fined $20.

Petitioner subsequently filed the instant action. The district court found that petitioner was not notified of either the October 4 or October 18 hearings in direct violation of DOC regulations. However, the court concluded that because petitioner was knowledgeable of his rights and knew how to protect himself, the error was harmless.

## PROTECTED LIBERTY INTEREST

K.A.R. 44-13-401a reads in relevant part:

"Each inmate charged with an offense shall be given advance written notice of the time and place of the disciplinary hearing. This notice shall be given not less than 24 hours before the hearing. Notice shall be given by the disciplinary administrator or other responsible person designated by the principal administrator."

Before answering the ultimate question of whether the claimed error here was harmless, this court must first determine if there was error at all. We are asked to determine if petitioner was denied due process of law because prison officials failed to follow the applicable regulations. The answer to this very troublesome issue, however, hinges on whether petitioner was entitled to due process, which is dependent on him having a liberty interest against being placed in disciplinary segregation.

A review of some Kansas appellate and federal decisions is helpful in our resolution of this issue.

## KANSAS CASES

Kansas appellate courts have recognized that the filing of a habeas corpus petition is the proper avenue to attack mistreatment by prison officials, *Levier v. State*, 209 Kan. 442, 449-50, 497 P.2d 265 (1972); placement in disciplinary segregation, *Shepherd v. Davies*, 14 Kan. App. 2d 333, 789 P.2d 1190 (1990); or placement in

administrative segregation, *Graham v. Nelson*, 20 Kan. App. 2d 896, 893 P.2d 294 (1995). However, a recent series of cases calls into question whether an inmate has a liberty interest, created by State action, against being placed in administrative or disciplinary segregation, thus entitling him or her to due process of law.

In *Levier v. State*, the inmates appealed the district court's denial of their habeas corpus actions which the court ruled did not state a claim upon which relief could be granted. The inmates alleged cruel and unusual treatment by prison officials due to the conditions each were subjected to in solitary confinement. 209 Kan. at 444-45.

Our Supreme Court recognized that in the past, the courts had adopted a "hands-off" doctrine, which meant the courts were without power to supervise prison administration or interfere with ordinary prison rules and regulations. The Supreme Court understood that adherence to this doctrine would mean that courts would not have subject matter jurisdiction over petitions from inmates alleging various forms of mistreatment or deprivation. However, the Supreme Court also noted: "As a matter of elemental justice such rights as an inmate has should not be without an effective means of enforcement. In the absence of adequate administrative procedures inmates should not be denied reasonable access to the courts." 209 Kan. at 449.

The *Levier* court held that a habeas corpus proceeding was an appropriate remedy where an inmate alleged mistreatment. The court noted:

"It should also be emphasized that prison officials as executive officers of the state are charged with the control and administration of the penal institutions of the state and as such are vested with wide discretion in the discharge of their duties. Under familiar rules, that discretion should not be interfered with by the courts in the absence of abuse or unless exercised unlawfully, arbitrarily or capriciously. Maintenance and administration of penal institutions are executive functions and it has been said that before courts will interfere the institutional treatment must be of such a nature as to clearly infringe upon constitutional rights, be of such character or consequence as to shock general conscience or be intolerable in fundamental fairness. It has further been said that the 'hands-off' doctrine operates reasonably to the extent it prevents judicial review of deprivations which are necessary or reasonable concomitants of imprisonment. . . . In other

words, disciplinary measures properly administered in accord with reasonable prison regulations are not subject to judicial review." 209 Kan. at 450-51.

The *Levier* court concluded the allegations of mistreatment presented went beyond mere discipline and reversed the case for an evidentiary hearing. The court said that disputes of fact should be determined administratively in a grievance procedure wherein the inmate is afforded basic elements of due process. 209 Kan. at 451.

This court took up the issue of an inmate's right to challenge his placement in disciplinary segregation in *Shepherd v. Davies*. The *Shepherd* court, quoting at length from *Hewitt v. Helms*, 459 U.S. 460, 466, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983), recognized that " '[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States.' " 14 Kan. App. 2d at 335. The Due Process Clause did not, in and of itself, grant an inmate the right to be free from disciplinary segregation, but a state could create a liberty interest by enactment of statutory or regulatory measures. 14 Kan. App. 2d at 336.

Citing *Wolff v. McDonnell*, 418 U.S. 539, 557-58, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974), the *Shepherd* court concluded that the provisions of the Kansas Administrative Regulations, Article 12 and 13, created a liberty interest in disciplinary proceedings where disciplinary segregation is imposed as punishment. Therefore, certain minimal procedural requirements must be met when the State has provided substantive rights regarding those hearings. 14 Kan. App. 2d at 336.

Recently, this court has revisited this issue in the context of inmates appealing their confinement to administrative segregation. In *Gray v. Nelson*, 20 Kan. App. 2d 900, Syl. ¶ 2, 893 P.2d 842 (1995), one panel of this court held that an inmate did have a liberty interest in not arbitrarily being placed in administrative segregation. The *Gray* court, relying on *Hewitt v. Helms*, concluded that Kansas regulations containing explicitly mandatory language in connection with requiring specific substantive predicates gave rise to a state-created liberty interest. 20 Kan. App. 2d at 906. The *Gray* court further concluded that because there was a liberty interest,

certain minimal due process rights attached. However, under the facts of that case, the court ultimately concluded the inmate was afforded the minimal due process required by *Hewitt*. No petition for review was filed.

On the same day *Gray* was filed, another panel of this court decided *Graham v. Nelson*, 20 Kan. App. 2d 896. The *Graham* court concluded that Kansas Administrative Regulations gave prison wardens the discretion to place inmates in administrative segregation and, therefore, this nonmandatory language, even when coupled with the mandatory procedural regulations, did not limit prison officials' discretion to the extent necessary to give rise to a liberty interest. 20 Kan. App. 2d at 898-99. The *Graham* court thus concluded that, absent a liberty interest, no particular process was due or required, regardless of state law. 20 Kan. App. 2d at 899. Again, no petition for review was filed.

## FEDERAL CASES

The case most heavily relied upon by petitioner is *Wolff v. McDonnell*. In *Wolff*, the United States Supreme Court examined whether inmates in Nebraska could challenge the disciplinary procedures of a state prison. 418 U.S. at 542-43. The inmates argued, among other things, that the disciplinary procedures did not comply with the Due Process Clause of the Fourteenth Amendment. The threshold issue was whether the procedures depriving inmates of good-time credit could be considered in a civil rights case. 418 U.S. at 554. The State argued that such procedures were a matter of policy and involved no constitutional issues. 418 U.S. at 555.

The *Wolff* Court noted that an inmate is not wholly deprived of all constitutional protections when imprisoned for a crime. Among the rights recognized was the right not to be deprived of life, liberty, or property without due process of law. However, the Court noted that prison disciplinary proceedings are not part of the criminal prosecutions and, thus, are not subject to the full panoply of rights initially due a defendant. 418 U.S. at 555-56.

The *Wolff* Court concluded there were two sources from which a liberty interest could arise:

"It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. . . . [I]t is true that the Due Process Clause does not require a hearing 'in every conceivable case of government impairment of private interest.' [Citation omitted.] But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within the Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." 418 U.S. at 557.

The *Wolff* Court held that inmates must be given written notice of the charges in a disciplinary action to enable them to prepare a defense, including a written statement of the findings by the fact-finders as to the evidence and the reasons for the decision. 418 U.S. at 564.

The United States Supreme Court next addressed inmates' liberty interests in *Meachum v. Fano*, 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976). In *Meachum*, the Court concluded that inmates did not have a liberty interest in not being transferred to a different facility, the conditions of which were substantially less favorable to the inmates. 427 U.S. at 228-29. The *Meachum* Court rejected the argument that any change in conditions of confinement suffered by an inmate was sufficient to invoke the Due Process Clause. 427 U.S. at 224.

The *Meachum* Court recognized that state law can create a liberty interest giving rise to a right to due process; however, it concluded that state law conferred the prisoner no rights as far as being transferred to another institution. 427 U.S. at 226. However, the Court said: "The individual States, of course, are free to follow another course, whether by statute, by rule or regulation, or by interpretation of their own constitutions. . . . Our holding is that the Due Process Clause does not impose a nationwide rule mandating transfer hearings." 427 U.S. at 229.

Next the United States Supreme Court decided *Hewitt v. Helms*, 459 U.S. 460. In *Hewitt*, an inmate claimed Pennsylvania's procedures placing him in administrative segregation violated his

rights under the Due Process Clause. The Court held that the Pennsylvania statutory framework governing the administration of the state's prisons gave rise to a liberty interest in a prison to remain in the general population. However, the Court ultimately held that the process employed was sufficient to satisfy the Due Process Clause. 459 U.S. 470-71.

The *Hewitt* Court said Pennsylvania had gone beyond the adoption of mere procedural guidelines and used language of

"an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed . . . and that administrative segregation will not occur absent specified substantive predicates . . . . . . .[T]he repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." 459 U.S. at 471-72.

"The creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, the State chose to require." 459 U.S. at 471.

In 1989, the United States Supreme Court decided *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 104 L. Ed. 2d 506, 109 S. Ct. 1904 (1989), in which inmates challenged the action of prison officials which denied visitation by certain individuals. The inmates argued that prison officials, by their own procedures, must hold a hearing before refusing the admittance of visitors. 490 U.S. at 456-58.

In analyzing the issue, the Court said:

"We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State [citation omitted]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient [citation omitted]. The types of interests that constitute 'liberty' and 'property' for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than 'an abstract need or desire' [citation omitted], and must be based on more than 'a unilateral hope' [citation omitted]. Rather, an individual claiming a protected interest must have

a legitimate claim of entitlement to it. Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.' [citation omitted.]" 490 U.S. at 460.

The *Thompson* Court went on to reject the notion that any change in conditions of confinement having a substantial negative impact on the inmate was sufficient to invoke due process protections. 490 U.S. at 460. " '[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed . . . and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. [Citation omitted.]' " 490 U.S. at 460-61. The Court further said that state law had created liberty interests in certain situations such as protecting a right to parole; freedom from involuntary transfer to a mental hospital; and freedom from more restrictive forms of confinement within a prison. In contrast, there was no liberty interest in remaining at one institution and not being transferred. While certain state regulations were found to create liberty interests and others did not, such determinations were based upon the Court's close examination of the relevant statutes and regulations. 490 U.S. at 461.

According to the *Thompson* Court:

"Stated simply, 'a State creates a protected liberty interest by placing substantive limitations on official discretion.' [Citation omitted.] . . . Our past decisions suggest . . . that the most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking, *Hewitt v. Helms*, 259 U.S., at 472, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met.

"Most of our procedural due process cases in the prison context have turned on the presence or absence of language creating 'substantive predicates' to guide discretion. . . .

"We have also articulated a requirement, implicit in our earlier decisions, that the regulations contain 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." 490 U.S. at 462-63.

In a footnote the Court said:

"It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for any imperative that might be found. The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether an inmate may be deprived of the particular interest in question." 490 U.S. at 464 n.4.

In *Thompson*, the Court concluded that the State regulations did not contain the requisite mandatory language because such regulations stopped short of requiring that a particular result be reached upon finding the substantive predicates were met. The stated procedures reserved to administrative staff the right to allow or disallow visits. The Court concluded this language was not mandatory because certain visitors may have been excluded under certain defined circumstances but they were not required to be excluded. Conversely, visitors could have been excluded even if they did not fall within the described categories of individuals who could be denied visitation. 490 U.S. at 464.

A case filed in 1994, which is cited in *Graham* , 20 Kan. App. 2d at 898, is *Templeman v. Gunter*, 16 F.3d 367 (10th Cir. 1994). In *Templeman*, an inmate sued the Colorado Department of Corrections when he was transferred from the general population to administrative segregation. According to Templeman, he was in administrative segregation for seven years. He claimed that the prison had denied him due process of law and equal protection. 16 F.3d at 368.

The Tenth Circuit Court of Appeals disagreed and concluded that Colorado laws and regulations did not create a liberty interest in remaining in the general population because transfer to administrative segregation was vested in the discretion of the prison officials. 16 F.3d at 369. Because Templeman had no liberty interest, he was not necessarily entitled to any due process under the Due Process Clause of the Fourteenth Amendment. The court said:

"Since Templeman was not deprived of any liberty to which he was entitled, no particular process was constitutionally due or required, regardless of state law. Nor does denying process, however mandatory under state law, itself deny liberty. [Citation omitted.] 'Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.' [Citation omitted.] Because Templeton had no liberty interest in

remaining in the general population, the Constitution did not require any particular process at all, even if state law did." 16 F.3d 371.

Recently, the United States Supreme Court reexamined the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause in *Sandin v. Conner*, 515 U.S. ___, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995). In *Conner*, the inmate sued prison officials for placing him in disciplinary segregation, claiming, among other things, that the disciplinary hearing process denied him due process of law. The trial court granted summary judgment in favor of prison officials. The Ninth Circuit Court of Appeals reversed, concluding Conner did have a liberty interest in being free from disciplinary segregation and then concluded there was a material question of fact as to whether Conner had received all the process he was due. The circuit court, citing *Wolff v. McDonnell* and *Kentucky Dept. of Corrections v. Thompson*, held that prison regulations mandated that an inmate be placed in disciplinary segregation when the inmate was found guilty of misconduct and the finding was supported by substantial evidence. 132 L. Ed. 2d at 425. By negative inference, the court found that because the prison committee could not impose segregation absent substantial competent evidence of misconduct, the language was mandatory and gave rise to a liberty interest. 132 L. Ed. 2d at 426.

Chief Justice Rehnquist, who also wrote *Hewitt v. Helms*, authored *Conner*. The *Conner* Court first recognized that the due process analysis in these types of cases begins with *Wolff*. While the *Conner* Court noted the language in *Wolff*, which concluded that the state statutory provision created a liberty interest giving rise to due process protections, the Court said: "Much of *Wolff's* contribution to the landscape of prisoners' due process derived not from its description of liberty interests, but rather from its intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due." 132 L. Ed. 2d at 426.

The *Conner* Court said that its decision in *Meachum v. Fano*, 427 U.S. 215, distinguished *Wolff* by focusing on the fact that in *Wolff* there had been a liberty interest created by state law, but in

*Meachum* there was no comparable mandatory language in state law. 132 L. Ed. 2d at 426.

According to the *Conner* Court, after *Meachum* the Court embarked on a different approach to defining state-created liberty interests:

"Because dictum in *Meachum* distinguished *Wolff* by focusing on whether state action was mandatory or discretionary, the Court in later cases laid ever greater emphasis on this somewhat mechanical dichotomy. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), foreshadowed the methodology that would come to full fruition in *Hewitt v. Helms*, 459 U.S. 460 (1983). . . .

"The Court made explicit in *Hewitt* what was implicit in *Greenholtz*. . . . Instead of looking to whether the State created an interest of 'real substance' comparable to the good time credit scheme of *Wolff*, the Court asked whether the State had gone beyond issuing mere procedural guidelines and had used 'language of an unmistakably mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.' [Citation omitted.] . . .

"As this methodology took hold, no longer did inmates need to rely on a showing that they had suffered a 'grievous loss' of liberty retained even after sentenced to terms of imprisonment. [Citation omitted.] For the Court had ceased to examine the 'nature' of the interest with respect to interests allegedly created by the State. . . .

. . . .

"By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. . . .

. . . .

". . . Not only are such regulations not designed to confer rights on inmates, but the result of negative implication jurisprudence is not to require the prison officials to follow the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature. . . .

"*Hewitt* has produced at least two undesirable effects. First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment. . . . Such guidelines are not set forth solely to benefit the prisoner. They also aspire to instruct subordinate employees how to exercise discretion vested by the State in the warden, and to confine the authority of prison personnel in order to avoid widely different treatment of similar incidents. The approach embraced by *Hewitt* discourages this desirable development: States may avoid creation of 'liberty' interests by having scarcely any regulations, or by conferring standardless discretion on correctional personnel.

"Second, the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." 132 L. Ed. 2d at 426-29.

The *Conner* Court concluded that the time had come to return to the due process analysis principles established in *Wolff* and *Meachum*. Under certain circumstances a state may create liberty interests which are entitled to Due Process Clause protections. However, these interests will generally be limited to freedom from restraint which imposes an atypical or significant hardship on the inmate in relation to the ordinary incidents of prison life. 132 L. Ed. 2d at 429-30.

In examining the conditions to which Conner was subjected, the Court said that prison officials, in response to many different levels of misconduct, have a wide range of disciplinary options which fall within the expected parameters of the sentence imposed. 132 L. Ed. 2d at 431.

The *Conner* Court specifically said:

"We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. . . . Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." 132 L. Ed. 2d at 431.

The Court stressed the fact that Conner's confinement to disciplinary segregation did not necessarily mean that he would not be eligible for parole. Nothing in the state code "required" the parole board to deny parole because of a record of misconduct or grant parole to those with a clean record. 132 L. Ed. 2d at 431-32.

Reduced to its essence, the thrust of the *Conner* decision is that the federal courts will not review a claim of deprivation of due process in these cases unless: (1) the state law and regulations structuring the authority of prison officials contains language of an unmistakably mandatory character requiring certain procedures must be employed, and the punishment will not occur absent specified substantive predicates, and (2) the discipline imposed repre-

sents a significant and atypical hardship on the prisoner which is not contemplated within the realm of conditions of the original sentence. Such a review will entail a case-by-case review based on the specific factual findings on the conditions of confinement.

## ADOPTION AND APPLICATION OF *CONNER*

We believe that if the Kansas Supreme Court would revisit this issue now, the court would follow the *Conner* rationale. Consequently, we conclude that the district court did not err when denying petitioner's 1501 petition. This record is devoid of any showing petitioner was subjected to any discipline which represents a significant and atypical hardship which is not contemplated within the realm of conditions of petitioner's original sentence.

## EFFECTIVE ASSISTANCE OF COUNSEL

Finally, petitioner argues he was denied effective assistance of counsel. He contends his trial counsel did not bring up the fact that he was placed in administrative segregation prior to the hearing and not given written notice as required by regulations. This point was not raised before the district court.

Pursuant to *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), if appellate counsel desires to raise an issue of ineffective assistance of counsel which has not been ruled on by the district court, counsel may seek remand if he or she follows the procedure for remand to consider newly discovered evidence. Counsel must file a motion and provide specific details to support the motion.

This record is not sufficient for us to determine if petitioner was denied effective assistance of counsel, and there is no motion for remand before this court. Consequently, this issue is not properly before this court.

Affirmed.