Tony CHANEY, Plaintiff-Appellant,†

v.

Rudy RENTERIA, Sgt. Sweeney, Officer Otto, Officer Delvaux, Officer Hammond and Pharis Brooks, Defendants-Respondents.

Court of Appeals

No. 94–2557. *Oral argument May 14, 1996.—Decided July 2, 1996.*

(Also reported in 554 N.W.2d 503.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James M. Brennan* and *Elizabeth L.R. Donley* of *Quarles & Brady* of Milwaukee. There was oral argument by *James M. Brennan.*

On behalf of the defendants-respondents, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Richard A. Perkins,* assistant attorney general. There was oral argument by *Richard A. Perkins.*

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.   This is a "prisoners' rights" case. Tony Chaney sued several of his guards, who we collectively refer to as "the State," claiming that they breached his due process rights when they kept him in adjustment segregation for twelve days longer than

they were supposed to. Chaney challenges the circuit court's finding that he did not suffer any tangible harm and its decision to grant summary judgment to the State.

We apply the Supreme Court's recent decision in *Sandin v. Conner*, 115 S. Ct. 2293 (1995), which requires us to look at the physical attributes of Chaney's confinement and determine if it is atypical before we may conclude that he has been deprived of a liberty interest. Under this test, we hold that Chaney has not suffered a deprivation of liberty because the conditions he faced while in adjustment segregation were not substantially different from what he previously experienced as an inmate within the corrections system.

■

Chaney challenges the circuit court's grant of summary judgment. On appeal, this court independently applies the summary judgment methodology and redetermines if summary judgment is appropriate. *See Preloznik v. City of Madison*, 113 Wis. 2d 112, 115-16, 334 N.W.2d 580, 582 (Ct. App. 1983). Therefore, we will present the facts in a light most favorable to Chaney. *See State v. American TV*, 146 Wis. 2d 292, 300, 430 N.W.2d 709, 712 (1988).

In June 1992, Chaney was an inmate at the Racine Correctional Institution. The prison's adjustment committee sentenced Chaney to five days of adjustment segregation after it found that Chaney had violated prison rules. *See* WIS. ADM. CODE § DOC 303.69. Chaney, however, was not part of the general population when he committed this offense; he was in program segregation. *See* § DOC 303.70. The State thus moved him from the program segregation facility into the

adjustment segregation area when he began the sentence on June 5, 1992.

After Chaney completed the five-day term, he contacted the guards and other prison officials to remind them that his time was up and asked them to return him to the program segregation facility where he was previously housed. According to Chaney, these guards and officials knew that the maximum term of adjustment segregation is eight days but nonetheless chose to rely on records which erroneously stated Chaney should not be released. *See* § DOC 303.69(1).

During his remaining time in adjustment segregation, Chaney continued complaining to prison officials and tried filing a formal complaint. *See generally* ch. DOC 310. Still, his requests for relief went unanswered. Chaney was not released from adjustment segregation until the error in the records was corrected on June 22. In total, Chaney was kept in adjustment segregation for seventeen days.

Chaney claims that he suffered various harms as a result of his confinement in the comparatively spartan conditions of adjustment segregation for twelve days beyond his official sentence. First, he claims psychological and emotional injuries. Second, he contends that he lost the opportunity to accrue six days worth of good time since persons in adjustment segregation do not earn good time. *See* § DOC 303.69(9). Third, he contends that two of his unrelated civil actions were dismissed because he was not given access to the prison library or a telephone and was unable to file responses.

In November 1993, Chaney, acting pro se, filed a complaint for what he termed a "Deprival of Due Process" under the United States and Wisconsin Constitutions and claimed compensatory and punitive damages, as well as restoration of his good time credit.

Under the broad reading that this court normally applies to pro se prisoner complaints, *see Culbert v. Young*, 140 Wis. 2d 821, 827-28, 412 N.W.2d 551, 554 (Ct. App. 1987), his complaint also suggests that he was pursuing a claim for tortious confinement. However, Chaney has retained pro bono counsel for the purposes of this appeal.[1] His counsel's appellate briefs and statements at oral argument reveal that Chaney made a claim under 42 U.S.C. § 1983, and not any independent due process claim under the Wisconsin Constitution or tort claim under Wisconsin civil law.

Chaney outlines his due process theory as follows. The applicable prison regulations mandate that he could only be placed in adjustment segregation for a maximum of eight days and could only be placed there after the State held a hearing where it proved that he had violated a prison rule. *See* § DOC 303.69(1). The State, however, kept him in segregation for seventeen days, which was twelve days beyond his original five-day sentence and nine days beyond the permitted maximum. Chaney argues that the extra days he spent in adjustment segregation amounted to an unconstitutional deprivation of his liberty because the State never held the hearing where it proved that it had reason to confine him for the extra time, or where Chaney could have otherwise challenged the State's decision to confine him for the extra time. Thus, Chaney suffered a procedural due process violation when the State stripped him of his protected liberty interest, that is, his "right" to return to program segregation after com-

---

[1] Attorney James Brennan serves as Chaney's pro bono appellate counsel and represented him at oral argument. This court commends Brennan and his law firm, Quarles & Brady, for their commitment to pro bono activities in this state.

pleting the five-day sentence, without first providing appropriate process.

In response, the State points to the evidence it placed before the circuit court when it moved for summary judgment. First, the State submitted an affidavit describing the different conditions for inmates in program segregation versus those placed in adjustment segregation. While the State seems to concede that Chaney's movement back to program segregation from adjustment segregation would have provided him with a "gradual but controlled increase in privileges," it otherwise contended that the basics—food, clothing and shelter—are the same in both types of confinement. Second, it provided affidavits showing that Chaney's records were corrected so that he could be credited with any lost good time.[2] Third, the State cited court records showing that Chaney's unrelated civil actions were not dismissed until October 1992 and that the opposing parties in these actions did not even file a motion to dismiss until July 23, about one month after Chaney left adjustment segregation.

We now turn to the sole question in this appeal, whether Chaney has stated a viable § 1983 claim even in the face of the State's rebuttal proof. Our analysis, however, must account for the United States Supreme Court's recent decision in *Sandin*, which was released after the circuit court's ruling.

___

[2] The State also cites WIS. ADM. CODE § DOC 303.84(2)(e), which suggests that good time credits accrue at the same rate for prisoners in adjustment and program segregation. Thus, it appears that the State's decision to backdate Chaney's records did not matter because the extra time Chaney spent in adjustment segregation had no effect because he would not have earned any good time had the State returned him to program segregation after the five days.

The *Sandin* decision establishes a new methodology for evaluating whether a prisoner has suffered a procedural due process violation. The old test, described in *Hewitt v. Helms*, 459 U.S. 460, 471-72 (1983), required a court to examine the applicable prison regulations and look for language which indicated if the regulations mandated certain procedures. In fact, the old test would seemingly apply to Chaney's claim because the pertinent DOC regulations provide that "Adjustment segregation may not exceed 8 days." Section DOC 303.69(1).

The goal of the exercise outlined in *Hewitt* was to gain insight about the state's treatment of the right which might be taken away via administrative procedures. The theory was that a state would only require stringent procedures if it had determined that the right was important. A prisoner who identified a breach in these mandatory procedures could then bring a due process claim for the loss of that liberty interest. *See Hewitt*, 459 U.S. at 471-72.

The *Sandin* Court determined that the *Hewitt* methodology had become impractical. Most notably, the Supreme Court was concerned that its previous methodology encouraged prisoners to comb through the various prison regulations, searching for the magical mandatory language which signaled an entitlement to some liberty interest. The Court believed that the *Hewitt* methodology contributed to a burgeoning number of cases in which prisoners tried to have the federal judiciary "fine tune" the states' prison systems. *See Sandin*, 115 S. Ct. at 2299-2300.[3]

---

[3] As an example, the Supreme Court cited *Burgun v. Nix*, 899 F.2d 733, 735 (8th Cir. 1990), where the prisoner claimed that he had a liberty interest in receiving a tray lunch rather

Accordingly, the Court set forth a new means of determining whether a prisoner held a liberty interest which would, correspondingly, require the state to provide that prisoner with procedural protection before the state took action against that liberty interest. The Supreme Court concluded that the analysis should focus on the physical attributes of what the prisoner was exposed to. It specifically held that constitutionally protected liberty interests would be limited to the "type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at 2301. [4]

After the *Sandin* Court set out this new test, it turned to the facts of the case. It rejected the prisoner's claim that he was denied due process when the state did not allow him to present witnesses at his disciplinary hearing. Regardless of the state's violation of rules which mandated that the prisoner be able to call witnesses, the Court concluded that the prisoner did not present a procedural due process violation because the net effect on him, being moved from the general population into special holding, did not present a "major disruption" from what he normally experienced as a person confined to the state prison system. *See id.*

than a sack lunch. *See Sandin v. Conner*, 115 S. Ct. 2293, 2300 (1995).

[4] We observe that the new "atypical, significant deprivation" test overrules at least one of our supreme court's earlier decisions involving a prisoner's § 1983 claim. In *Irby v. Macht*, 184 Wis. 2d 831, 841-42, 522 N.W.2d 9, 13, *cert. denied*, 115 S. Ct. 590 (1994), the court premised its conclusion that the prisoner had suffered a loss of liberty on the language used in the applicable regulations. *See Kirsch v. Endicott*, 201 Wis. 2d 702, 712, 549 N.W.2d 761, 765 (Ct. App. 1996).

As one would expect, Chaney tries hard to distinguish his case from *Sandin*. Although what he experienced in adjustment segregation may not have been much different from what he experienced in program segregation, Chaney contends that his confinement to the twelve extra days was nonetheless "atypical" because it was "indeterminant." He argues that the State took from him the only modest comfort that an inmate enjoys while he or she is confined or segregated: the confidence that the State can only keep him or her confined for the maximum period written in the rules. Thus, Chaney explains that prison officials who ignore the rules and hold an inmate in segregation beyond the established maximums subject that inmate to an atypical deprivation, and, similarly, prison officials who do not inform the inmate of the maximum time which he or she will be in segregation deprive that inmate of a very significant liberty interest.

The State, however, argues that the time spent in segregation is not an important factor under the *Sandin* test. Rather, the only issue that courts should be concerned with is the physical nature of confinement. In support of this position, the State provides us with authority from other jurisdictions that have applied the *Sandin* analysis to claims similar to Chaney's and have held that confinement to segregated portions of a correctional facility for disciplinary reasons cannot result in a deprivation of liberty because such confinement is not "atypical" treatment within an American correctional facility. For example, in *Williams v. Ramos*, 71 F.3d 1246 (7th Cir. 1995), an inmate at an Illinois prison claimed that he was deprived of a liberty interest without due process when, contrary to Illinois' regulations, he was confined to disciplinary segregation without a hearing. The

court held, however, that he failed to state a § 1983 claim because his treatment while in segregation did not greatly exceed what a prisoner could expect from prison life generally. *Id.* at 1249. *See also Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1690 (1996); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995); *Davis v. Finney,* 902 P.2d 498, 506-07 (Kan. App. 1995).

We independently observe that another panel of this court has recently employed the *Sandin* analysis to disciplinary rules at another Wisconsin prison. In *Kirsch v. Endicott*, 201 Wis. 2d 702, 715, 549 N.W.2d 761, 768 (Ct. App. 1996),the court concluded that an inmate at the Columbia Correctional Institution lost no liberty interest when prison officials placed him in a particularized system of punishment, termed "management continuum." This program was developed for violent inmates who are already in adjustment segregation. Under it, the inmate was placed in a special "hardened" cell, given crayons instead of pencils and pens, and was subjected to frequent strip searches. *Id.* at 708, 549 N.W.2d at 763. The *Kirsch* panel reasoned that management continuum did not cause such a major change in the physical conditions of the inmate's confinement and thus the prison officials did not violate his liberty interests when it placed him there. *Id.* at 708-09, 549 N.W.2d at 764.

However, the *Kirsch* panel and the other courts applying *Sandin* have not answered the precise issue which Chaney believes makes his claim unique: whether confinement in segregation beyond the established maximum period constitutes atypical treatment, or whether a prison official's decision not to inform the inmate of when he or she will be released from segrega-

tion constitutes a significant deprivation of a liberty interest.[5]

■

We believe, however, that *Sandin* and the cases interpreting *Sandin* instruct that we should focus only on the physical characteristics of the confinement. We therefore hold that an inmate's confidence in the maximum time he or she will be specially segregated does not signal whether a protected liberty interest is involved.

We rely not only on the cases cited by the State, but also on dicta within the *Sandin* decision. As we noted above, the Court did not face an inmate who had been confined in segregation beyond the maximum allowed time. Still, the Supreme Court implicitly suggested how an inmate's knowledge about the time he or she was required to remain in segregation might affect the analysis of whether that inmate had a protected liberty interest in knowing what that maximum time was. The Court hinted that time was only a factor when the question involved the inmate's ultimate sentence. We gather this from the *Sandin* decision because the opinion carefully distinguishes the facts of that case from a situation in which "the State's action will inevitably affect the duration of [the prisoner's] sentence." *See Sandin,* 115 S. Ct. at 2302. Although Chaney may not have known when he was going to be released from adjustment segregation, the only time factor that

---

[5] The opinion in *Kirsch,* 201 Wis. 2d at 708, 549 N.W.2d at 763, indicated that the prisoner in that case was subject to specialized segregation for at least thirty days. But the opinion does not explain if the rules stated the *maximum* time in which the prisoner was subject to specialized confinement. Therefore, we conclude that the *Kirsch* panel did not address the maximum time question that Chaney presents.

courts are concerned with after *Sandin* is the time that the inmate is ultimately required to spend confined under the authority of the state prison system.

■

Accordingly, when we consider the *Sandin* analysis together with the State's rebuttal proof showing that there is little respective difference between the conditions of adjustment segregation and program segregation, we conclude that Chaney's improper confinement, in and of itself, provides no grounds for a § 1983 claim. Nevertheless, we must also consider his claims for the possible loss of good time credit, which does relate to the amount of time he will spend confined in the Wisconsin prison system, and his consequential damages resulting from his inability to pursue his unrelated court actions.

In regard to these two latter claims, our independent review of the summary judgment proof indicates that neither requires that Chaney's case go to trial. The record shows that the State has made the necessary adjustments to Chaney's prison record so that he will receive any good time credit he is entitled to. Likewise, the State's proof rebuts Chaney's factual assertions that he was somehow prevented from pursuing his unrelated civil actions.

■

In sum, even when we view the facts of Chaney's theory as true, and accept that the guards and officials at the Racine Correctional Institution were determined to keep Chaney in adjustment segregation beyond the permitted maximum, he has not stated a § 1983 claim because the physical nature of confinement that he was subjected to in adjustment segregation was not atypical to, or significantly different from, what he was subjected to while he was in program segregation.

Since there is very little difference in treatment between adjustment segregation and program segregation, Chaney did not suffer a loss of liberty when the State wrongly confined him to adjustment segregation.

We nonetheless caution that we do not read *Sandin* to license the State to ignore its own rules and indiscriminately move prisoners into and out of the various forms of detention.

First, the *Sandin* decision only dictates how this court must construe § 1983 claims. In that regard, Chaney's § 1983 claim is necessarily limited to the precise facts before us: does a prisoner in program segregation experience an atypical change in confinement when he or she is moved into adjustment segregation.

Second, and of equal importance, this case does not require us to explore the possibility of whether prisoners claiming that they were confined in a manner inconsistent with the administrative rules have a state remedy. The Supreme Court carefully tailored *Sandin* only to address the issue of prisoner litigation within the federal courts. The last footnote of Chief Justice Rehnquist's majority opinion indeed explains:

> Prisoners such as Conner, of course, retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available.

*Sandin*, 115 S. Ct. at 2302 n.11. This passage informs us that the Supreme Court was focused on *who* should be enforcing prisoners' constitutional rights, as well as exactly *what* those rights are.

When the majority set out the "atypical" and "significant deprivation" test, it was only referring to how the federal courts (and states applying federal law) should handle claims arising under the Fourteenth Amendment. Since the Supreme Court rationalized its new test on the concerns it had about the "involvement of *federal courts* in the day-to-day management of prisons," *id.* at 2299 (emphasis added), this footnote summarizes the Court's conclusion that federal judicial intervention should be limited to issues of cruel and unusual punishment and core First Amendment values such as freedom of religion.

But the Court's reference to possible state remedies otherwise suggests that it was inviting state courts to open their doors and become more involved in settling issues, presumably under the mantra of state constitutional law or common law, which traditionally had been litigated in the federal system as § 1983 claims. That discussion, however, must await a different case.

So while Chaney and future prisoners who are equally situated will have no § 1983 claim, this opinion does not provide the State with a blanket license to ignore the various administrative regulations and to treat prisoners in any manner it sees fit. Furthermore, this opinion does not shield the State from every possible § 1983 claim.

*By the Court.*—Judgment affirmed.